## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

Scott Matthew Huggins

Debtor

Chapter 13

Case No.  23-00184-EG

Scott Matthew Huggins

Plaintiff(s),

v.

Louise Grant

Defendant.

Adv. Proc. No.  23-80013-EG

**ORDER AND JUDGMENT**

The relief set forth on the following pages, for a total of 40 pages including this page, is hereby ORDERED.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>Scott Matthew Huggins<br><br>Debtor<br><br>---<br><br>Scott Matthew Huggins<br><br>Plaintiff(s),<br><br>v.<br><br>Louise Grant<br><br>Defendant. | Chapter 13<br><br>Case No.  23-00184-EG<br><br><br>Adv. Proc. No.  23-80013-EG<br><br>**ORDER AND JUDGMENT** |

This adversary proceeding arises from the underlying chapter 13 case *In re Scott Matthew Huggins*, Case No. 23-00184-EG and a state court action *Scott Matthew Huggins v. Louise Grant*, Case No.: 2020-CP-10-03614 removed to this Court by the Plaintiff. A Consent Scheduling Order was entered by the Court on April 3, 2023 (Dkt #8), whereby the parties consented to this Court's jurisdiction and ability to enter final orders or judgments pursuant to 11 U.S.C. § 157(b)(3). The Court held a trial on October 25th and 26th, 2023, and both parties were represented by counsel. No causes of action have been abandoned by either party. Pursuant to Fed. R. Civ. P. 52, as made applicable to this proceeding under Fed. R. Bankr. P.

7052, the Court makes the following Findings of Fact and Conclusions of Law.[1] Based on the pleadings, testimony, and evidence presented at trial, the Court finds for the Defendant as set forth below.

## FINDINGS OF FACT

1. The Defendant, Louise Grant ("Grant") purchased real property located at 89 America Street, Charleston, South Carolina (the "Property") with her husband, Andrew Grant, on or about May 30, 1973. The Property was titled in the names of Louise and Andrew Grant and was encumbered by a mortgage ("Fleet Mortgage") with Fleet Mortgage Corporation ("Fleet"). *See* Defendant's Exhibit "A".

2. The Fleet Mortgage had an original principal balance of $20,450.00 at an interest rate of 7.00%. Under the Fleet Mortgage, the Grants were to pay $136.20 per month for 360 months, with a maturity date of June 2003. *See* Defendant's Exhibit "A".

3. Andrew Grant passed away on or about September 13, 1996, and Grant continued making payments under the Fleet Mortgage. *See* Defendant's Exhibit "L".

4. On or about December 19, 1997, Fleet filed an action to foreclose upon the Property for failure to make timely monthly payments. At the time of the foreclosure, the Fleet Mortgage could have been reinstated for $4,922.90 and could have been paid in full for $7,961.34. *See* Defendant's Exhibits "A", "D", and "E".

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

5.  At the time of Fleet's foreclosure action, Grant had lived at the Property for over 24 years and had built up significant equity in the home. The approximate value of the Property in 1998 was between $57,000 and $67,000, indicating that Grant had equity in excess of $45,000. As the homeowner of the Property, Grant would have been entitled to any surplus resulting from a public sale. *See* Defendant's Exhibit "FF" and Plaintiff's Exhibit "16".

6.  In late 1997 or early 1998, Grant, a black woman of approximately 50-years-old, facing both the death of her husband and the potential loss of her home was approached unsolicited by a white man, 24-year-old Scott Huggins ("Huggins"). Although the parties disagree as to the exact content of this first meeting, Huggins indicated that he wanted to help Grant with her financial hardship and resolve the foreclosure.

7.  Huggins was then working in the medical industry and was neither a realtor nor an attorney. Huggins testified he was attempting to enter the real estate industry by targeting distressed homes facing foreclosure actions. Huggins located Grant and the Property through a search of public records.

8.  Huggins approached Grant and held himself out as a person who could solve her financial hardships, allowing her to remain in the Property. Under this premise, Grant relied upon Huggins and followed his direction to resolve her foreclosure.

9.  Huggins designed a real estate scheme to resolve Fleet's foreclosure whereby he prepared and provided several documents for Grant to execute. Huggins' real estate scheme included: (1) directing Grant to consolidate all outstanding interests

4

in the Property through numerous quit-claim deeds as well as a deed of distribution from her late husband's estate; (2) executing a Real Estate Sale Contract ("Sale Contract"); and (3) executing an Option to Repurchase Agreement ("Repurchase Agreement"). *See* Defendant's Exhibits "B", "C", "F", "G", "H", "I", "J", "K", "L".

10. The first step in Huggins' scheme was for Grant to consolidate all outstanding interests in the Property before transferring the Property to Huggins. Grant received numerous quit-claim deeds and a deed of distribution from her late husband's estate. None of those documents were prepared by her and she was not the Personal Representative of her husband's probate estate. Huggins' address was listed as the return address for the quit-claim deeds and Huggins served as a witness for the deed of distribution. *See* Defendant's Exhibits "F", "G", "H", "I", "J", "K", "L".

11. Next, on January 13, 1998, Grant and Huggins entered into the Sale Contract whereby Grant sold the Property, in which she had equity in excess of $45,000, to Huggins for and in consideration of one dollar ($1.00). Grant then deeded the Property over to Huggins once the title was unified. *See* Defendant's Exhibits "C" and "FF" and Plaintiff's Exhibits "2" and "27".

12. The final step of Huggins' scheme was for Grant to execute the Repurchase Agreement, which is the central document in this controversy. The uncontested terms of the Repurchase Agreement provide in pertinent part:

(a) Grant was required to pay Huggins $219 per month for 360 months (Totaling $78,840);

(b) A forfeiture clause stating "should [Grant] fail to perform as herein agreed, this contract is null and void and has no further effect and [Grant] shall have 3 days after such failure to vacate [the Property]; and

(c) "this instrument shall not be recorded."

13. The core dispute as to the Repurchase Agreement is with respect to the terms of Grant's option to repurchase the Property. The option to repurchase portion of the Repurchase Agreement provides:

> "if [Grant makes all her monthly payments], the sellers give [Grant] the right to purchase the [Property] for the sum of $10 (ten dollars) **plus all closing costs and other expenses incidental to the purchase** of [the Property] including, but not limited to maintenance costs, improvement costs, and legal fees and subject to an existing mortgage in favor of [Fleet], which balance was approximately $7,961.34 on January, 1998."

(Emphasis Added). *See* Defendant's Exhibit "B" and Plaintiff's Exhibit "1".

14. Grant testified that under the Repurchase Agreement she could repurchase the Property free and clear of liens for $10 "plus costs incidental to the closing." Grant further testified that these "costs" meant the execution and recording of a deed back to her.

15. Huggins testified that the "closing costs and other expenses incidental to the purchase" included all property taxes, hazard insurance, flood insurance, and legal fees paid over the life of the Repurchase Agreement. No such language appears in the Repurchase Agreement.

6

16. Plaintiff submitted a document, admitted as Exhibit 24, indicating that Huggins paid $27,469.44 in property taxes, $21,026.94 in hazard insurance, $10,175 in flood insurance, and $74,505.09 in attorney's fees (totaling $133,176.47).

17. Huggins testified that under the terms of the Repurchase Agreement, Grant was required to pay $219 per month for 360 months, totaling $78,840. Huggins testified that once Grant completed every monthly payment, she could exercise her option to repurchase by paying the defined $10 plus "costs", consisting of an undisclosed and undefined amount of insurance, taxes, and fees incurred over the life of the Repurchase Agreement. Huggins further testified that the "costs" for Grant to exercise her option to repurchase were in excess of $133,000[2].

18. The option to repurchase does not define "costs and other expenses incidental to the purchase." Huggins testified that the phrase "incidental to the purchase" as used in the option to repurchase referred to Grant's repurchase of the Property.

19. According to Huggins' scheme, Grant and her family could remain in the Property in exchange for Grant (a) selling her entire interest in the Property to Huggins for $1.00; (b) paying Huggins more than $78,000 over a 30-year period; and (c) after completing 360 monthly payments without fail, pay an undisclosed and undefined balloon payment consisting of taxes, insurance, and legal fees incurred over the 30 year life of the Repurchase Agreement. If Grant missed a single monthly

---

[2] Plaintiff's exhibit 24 also included additional costs associated with a payment increase set forth in a document executed by the parties identified as an Addendum/Amendment. Pursuant to Exhibit 24, Huggins testified that the total "costs" for Grant to exercise her option to repurchase was $233,742.15.

payment or was unable to make the undefined balloon payment, she was subject to

a rapacious and unforgiving forfeiture provision which states that "said privilege

and exercise shall there upon wholly cease but no liability to refund the money paid

therefore shall arise." *See* Defendant's Exhibits "B", "C", and "W" and Plaintiff's

Exhibits "1" and "2".

20.  In reliance on Huggins' representations and promises, Grant executed all

the documents in Huggins' scheme, including the Sale Contract, Repurchase

Agreement, a quit-claim deed, and a corrective general-warranty deed conveying

the Property to Huggins. Most of the documents provided by Huggins were not

prepared by an attorney, but by Huggins himself. *See* Plaintiff's Exhibits "1", "2",

"6" and "27".

21.  Simultaneously with the execution of the corrective general warranty deed

executed on July 23, 1998, Huggins took out a mortgage on the Property with

Nationscredit Financial Services Corp. for $25,000.47. The proceeds of the new

mortgage went to Huggins. *See* Defendant's Exhibit "EE".

22.  On or about November 27, 2000, Huggins applied for a $35,000 home equity

line of credit utilizing the Property. Though there is no evidence that the loan was

finalized, Huggins' application claimed that the Property was an investment

property with a market value of $68,000. *See* Defendant's Exhibit "FF".

23.  On or about November 19, 2001, Huggins took out a $56,000 mortgage on

the Property from Wachovia Bank and satisfied the Nationscredit mortgage. On

April 26, 2012, Huggins executed a mortgage modification with Wells Fargo to

extend the term of the Wachovia mortgage to April 2027. The proceeds from the Wachovia/Wells Fargo mortgage went to Huggins. *See* Defendant's Exhibit "JJ".

24.   Any lender, creditor, or subsequent third-party purchaser, including the banks that gave Huggins a mortgage, would not have been aware of Grant's potential interest in the Property because Huggins prevented the Repurchase Agreement from being recorded.  *See* Defendant's Exhibit "B" and Plaintiff's Exhibit "1".

25.   Grant filed a chapter 13 bankruptcy petition on April 15, 2013 (Case No. 13-2221-JW). Grant did not explicitly list the Repurchase Agreement in her schedules or chapter 13 plan. Grant did list a $219 amount owed under "monthly rent or home mortgage payments." Grant's chapter 13 plan was confirmed without objection on June 7, 2013. An Order granting a discharge was entered on August 23, 2016, and the case remained open until September 2, 2016. Grant made continuous payments and remained current under the Repurchase Agreement throughout her bankruptcy. Grant's 2013 Bankruptcy did not alter the terms of the Repurchase Agreement. Huggins accepted all payments from Grant during her bankruptcy. *See* Defendant's Exhibits "O", "P", and "Q" and *See* Plaintiff's Exhibits "9", "10", "11", and "12".

26. Grant bore the maintenance costs related to the Property throughout the life of the Repurchase Agreement, including repainting twice and replacing half the roof in 2014.  Huggins provided no maintenance for the property.

27.  Grant performed under the Repurchase Agreement from 1998 until June 2016, completing 220 monthly payments without fail. Grant was current under the Repurchase Agreement throughout and in June 2016 had 140 months remaining, consisting of approximately $30,660.00. *See* Plaintiff's Exhibits "23" and "24".

28.  In June 2016, while Grant was making payments in her active chapter 13 bankruptcy, Huggins approached Grant to modify the Repurchase Agreement. Huggins prepared a document titled "Addendum/Amendment," a form document that contained a provision "Other: Lease Option" (the "Addendum"). The uncontradicted terms of the Addendum include raising the monthly payments from $219 per month to $860 per month for the remaining 140 months of the term. The Addendum added approximately $90,000 to Grant's obligation under the Repurchase Agreement. *See* Defendant's Exhibit "M" and Plaintiff's Exhibit "8".

29.  Grant testified that she received no benefit under the Addendum, that Huggins represented to her that she still owed $30,000 under the Repurchase Agreement, and she believed that she was paying off the remaining obligation before the end of the term of the Repurchase Agreement.

30.  Huggins testified that the Addendum was required due to higher property taxes and insurance. Huggins testified that under the Addendum, the balloon due at execution of Grant's option to repurchase would stop accruing and that Grant was paying the "costs" of the balloon ahead of time.

31.  Huggins also testified and Counsel for Huggins repeatedly asserted that Grant's children were added as "optionees" under the Repurchase Agreement,

although that term is not used in the Addendum and there is no language in the
Addendum to that effect.

32. Grant and Huggins executed the Addendum on June 28, 2016.

33. Though property taxes were the responsibility of Huggins, Grant paid the
Property taxes for 2018 and 2019 in the amounts of $2,089.70 and $2,133.60
respectively (totaling $4,223.30). Huggins conceded at trial that he had not
reimbursed Grant for the $4,223.30 she paid in property taxes. *See* Defendant's
Exhibits "R" and "S".

34. Grant paid Huggins $860 per month from July 2016 until June 2019,
consisting of 35 monthly payments totaling $30,100.00. *See* Plaintiff's Exhibit "23"
and "24".

35. In July 2019, Grant testified that she contacted Huggins asserting full
performance of her responsibilities under the Repurchase Agreement and sought to
exercise her option to repurchase. Grant testified that Huggins represented he
would return the deed to the Property, but that at some point Huggins stopped
responding to her requests and those made on her behalf.

36. In September 2019, Grant approached Charleston Pro Bono Legal Services
("CHS Pro Bono") for legal advice and assistance with regard to damages suffered
due to Huggins' scheme.

37. On September 25, 2019, CHS Pro Bono sent a letter to Huggins on Grant's
behalf, demanding his performance under the Repurchase Agreement by returning

the Property via warranty deed, unencumbered as required by the Repurchase

Agreement. *See* Defendant's Exhibit "V".

38. On October 9, 2019, Huggins sent a letter to Grant stating that she had

breached the Repurchase Agreement and must vacate the Property. Huggins' letter

states "[p]er our agreement any missed payment voids and terminates your option

to purchase agreement dated January 18, 1998 therefore your option to purchase

agreement is now void and terminated." *See* Defendant's Exhibit "W".

39. On July 17, 2020, Huggins initiated state court proceedings to evict Grant

from the Property. The Charleston County Magistrate before whom the case was

pending transferred the case to the Charleston County Court of Common Pleas, and

the case was referred to the Charleston County Master-in-Equity. The Magistrate's

Order transferring the case states "I find that the defendant … has filed a

counterclaim with this court seeking damages in excess of the current civil

jurisdiction of magistrate court, and … Defendant has asserted a color of title claim

to the [Property]. *See* Defendant's Exhibits "AA" and "BB".

40. In the state court case of *Scott Matthew Huggins v. Louise Grant*,

Charleston County Case No.: 2020-CP-10-03614 ("State Court Action"), Huggins

moved for summary judgment on April 22, 2022. Grant filed her brief in opposition

to summary judgment on June 2, 2022. Huggins motion for summary judgment

included causes of action for both judicial estoppel and collateral estoppel. On June

6, 2022, the Master-in-Equity denied Huggins' motion for summary judgment and

set the case for trial. *See* Defendant's Exhibit "CC"

12

41.  Huggins filed the underlying chapter 13 bankruptcy case (23-00184-EG) on January 19, 2023, and filed this Adversary Proceeding removing the pending State Court Action to this Court on February 22, 2023.

42.  A Consent Scheduling Order was entered by the Court on April 4, 2023 (Dkt. #9).

43.  Pursuant to the Consent Scheduling Order, the parties consented to the removal of the State Court Action to this Court under 28 U.S.C. § 1452 and have consented to the entry of final orders or judgments by this Court.

44.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 157, and 1334.

## CONCLUSIONS OF LAW

Both Plaintiff and Defendant have asserted several causes of action and have neither waived nor settled any of their claims. Plaintiff's main contention at trial was that Defendant should be judicially estopped from asserting her interest in the Property because she failed to assert that interest during her 2013 bankruptcy filing. Defendant's main contentions are: (1) that all causes of action herein are a result of Huggins' breach of contract and/or Grant's discovery of the super balloon payment in 2019; (2) the contracts involved in Huggins' scheme were unconscionable; (3) that the Repurchase Agreement be characterized as an equitable mortgage; (4) that Grant be declared to have redeemed the Property under the Repurchase Agreement and that Huggins breached by failing to reconvey; (5) that the 2016 Addendum is unenforceable; (6) that Huggins misled and

13

misrepresented the facts to induce the execution of his scheme; and (7) that Huggins engaged in unfair and deceptive trade practices that resulted in this litigation.

### Unconscionability of Repurchase Agreement

In South Carolina, "unconscionability is defined as the absence of meaningful choice on the part of one party due to one-sided contract provisions together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Hudson v. Hudson,* 408 S.C. 76, 83 (2014) (citing *Hardee v. Hardee,* 355 S.C. 389, 390, 585 S.E.2d 501, 505 (2003). "Courts are limited to considering the facts and circumstances that exist at the time of the execution of the contract when determining unconscionability." *Id.* (citing *Holler v Holler,* 364 S.C. 256, 269, 612 S.E.2d 469, 476 (Ct. App. 2005)).

Here, the real estate scheme proffered by Huggins was unconscionable because the terms were so oppressive that no reasonable person would agree to them. Under Huggins' predatory scheme, he never intended for Grant to repurchase the Property and knew that he could obtain title to the Property by waiting her out. Under Huggins' scheme, Grant was to (1) sell her home worth approximately $60,000, and in which she had equity in excess of $45,000, for $1.00; (2) pay Huggins over $78,000 to resolve a foreclosure debt of approximately $12,000; (3) make 360 consecutive monthly payments subject to a strict and rapacious forfeiture provision; (4) was prevented from recording the agreement; and (5) face an undisclosed balloon payment at the conclusion of the agreement. Plaintiff argued that his expenditures

14

for taxes and insurance from 1998 to 2023 (Totaling $66,433.76) balance out the difference between what Plaintiff initially spent to acquire the Property and what he has paid over-time. However, that argument fails to consider that Plaintiff also received proceeds from multiple mortgages as a result of his homeownership. Being the owner allowed Huggins to receive benefits from encumbering the Property and likewise made him responsible for paying property taxes and insurance. Grant did not have the benefit of receiving the proceeds from multiple mortgages and likewise would not have been responsible for paying property taxes and insurance. Plaintiff's payment of property taxes and insurance from 1998 to 2023 does not constitute consideration and did not benefit Grant. Considering the facts and circumstances surrounding the parties at the time they entered the Repurchase Agreement, it is clear that all the documents included in Huggins' scheme contained such one-sided provisions that the Repurchase Agreement is unconscionable and is therefore unenforceable.

At trial, Huggins attempted to introduce a "holographic" document purporting to be a document signed by Grant and notarized in connection with the transaction. The document was not authenticated by any witness, Grant denied she signed it, and there was no testimony as to who wrote or dictated the language in the document. Judging by how one-sided and self-serving the language of the document is, it seems rather obvious that it was drafted by the party favored by the writing. Defendant objected to its introduction into evidence based upon the parol evidence rule.

15

The parol evidence rule prevents the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to the execution of a written instrument when the extrinsic evidence is to be used to contradict, vary, or explain the written instrument. *Gilliland v. Elmwood Props.,* 301 S.C. 295, 302, 391 S.E.2d 577, 581 (1990). The parol evidence rule is particularly applicable where the written instrument contains a merger or integration clause. *U.S. Leasing Corp. v. Janicare, Inc.,* 294 S.C. 312, 318, 364 S.E.2d 202, 205 (Ct. App. 1988). The document cannot be admitted, the objection is sustained, and the Court will not consider such evidence in the determination of the Repurchase Agreement. Any ambiguity in the Repurchase Agreement or Sale Contract is a result of Huggins' drafting the documents, and Huggins cannot now rely on his own created ambiguity to enter extrinsic evidence into the record. However, the document, together with the Sale Contract and Repurchase Agreement tend to show that Huggins anticipated problems with the enforceability of the transaction and attempted to include a self-serving provision such as a statement denying the making of a loan[3], prevention of recording, and a waiver of right to counsel.

While Grant asserts the entire Huggins' real estate scheme to be unenforceable due to its unconscionability, Grant still substantially performed under the Repurchase Agreement. According to Huggins' own exhibits, Grant paid him a total of $78,718 in monthly payments from 1998 until 2019, and an additional $4,223.30

---

[3] The "holographic" document contains language that indicates that Grant had not received a loan; however, the language of the other documents prepared by Huggins clearly indicate that Grant had an obligation to make payments to Huggins in a specified amount and for a specified period of time. That language is therefore inconsistent with the tenor and clear language of the other documents signed at the time the "holographic" document was purportedly executed.

in property taxes. Grant asserts that if the Repurchase Agreement is found to be
enforceable, then she has fully performed and is entitled to exercise her option to
repurchase and receive the Property unencumbered. The facts are consistent with
Grant's contention and the Court finds that the option to repurchase as well as the
scheme to deprive Grant of her property is unconscionable and therefore
unenforceable.

### Treatment of the Repurchase Agreement as an Equitable Mortgage, Retail Installment Contract, or Lease

In South Carolina, "an equitable mortgage is a transaction that has the intent,
but not the form of a mortgage which a court will enforce in equity to the same
extent as a mortgage. Stated simply, where one party conveys a deed to another,
but the evidence surrounding the transaction indicates the land transfer was
intended only to secure a debt, a court may refuse to treat the conveyance as a sale
and instead equitably impose on the parties the mortgage they intended to create."
*Walker v. Brooks,* 414 S.C. 343 (2015). "For an equitable lien to arise, there must be
a debt owing from one person to another, specific property to which the debt
attaches, and an intent, expressed or implied, that the property will serve as
security for the payment of the debt." *First Federal Savings and Loan Association of
Charleston v. Bailey,* 316 S.C. 350, 356, 450 S.E.2d 77, 80-81 (Ct. App. 1994). "The
essential feature or essence of an equitable mortgage is the intent of the parties.
The intent of the parties is to be evaluated at the time of conveyance." *Walker v.
Brooks,* 414 S.C. 343 (2015). The South Carolina Supreme Court clearly enumerated

certain factors tending to prove an intent to form an equitable mortgage in *F. Gregorie & Son v. Hamlin,* including (a) the existence of a debt surviving the conveyance; (b) the existence of a deed and a separate agreement to reconvey; (c) a lack of discussion between the parties regarding an absolute sale, price, or consideration; (d) the gross inadequacy of consideration; (e) the dealings between the parties could be characterized as debtor and creditor; and (f) the clear intentions of the parties set out in the terms of the agreement for reconveyance. 273 S.C. 412, 419 257 S.E.2d 699, 702 (1979).

From the pleadings and testimony of both parties, it was clear that at the time the parties entered into the Repurchase Agreement and Sale Contract, they intended for Grant to remain in the Property and to eventually exercise the option to repurchase. Here, there is (a) an existing debt for Grant to pay Huggins after conveying him the Property; (b) both a deed to Huggins and a separate contract to reconvey to Grant; (c) no evidence presented regarding an absolute sale of the Property; (d) an objectively inadequate amount of consideration paid for the Property; (e) a course of dealings involving 255 consecutive monthly payments easily characterized as a debtor and creditor relationship; and (f) the terms of the Repurchase Agreement clearly center around Grant's option to repurchase the Property. The facts of this case strongly support all the elements for an equitable mortgage, including the key factor of the parties' intent at time of execution. No evidence has been presented to indicate that Grant knowingly intended to sell her significant interest in Property for $1.00, in exchange for the ability to rent or lease.

Huggins' attempt to now invoke the forfeiture clause and strip Grant of all interest in the Property is repugnant in both law and equity. The Repurchase Agreement and other documents in Huggins' scheme support the finding that the parties intended an equitable interest for Grant in the Property which cannot be terminated through an eviction action.

Though Huggins initially characterized the transaction as a lease, he apparently abandoned that characterization indicating in his pre-trial brief and at trial that the Repurchase Agreement should be treated as an installment land sale contract with a redemption price of $233,742.15. In South Carolina, an installment land sale contract is one in which the vendor retains legal title to the property until the entire purchase price has been paid, and the purchaser is entitled to immediate possession. *Lewis v. Premium Inv. Corp.,* 351 S.C. 167, 171-72 (2002). Generally, these contracts contain a forfeiture clause entitling the vendor to terminate the contract, recover the property, and retain all installments paid in the event of default. *Id.* at 171. Land sale agreements of this nature have long been called a "poor man's mortgage" because the vendor finances the purchaser's acquisition of the property, much like a mortgage, yet the purchaser does not receive the benefit of remedial statutes protecting the rights of mortgagors. *Id.* (adopting *Ellis v. Butterfield,* 98 Idaho 644, 570 P.2d 1334, 1336 (Idaho 1977). South Carolina Courts hold that provisions in installment land contracts declaring forfeiture in the event of default can constitute a penalty where the sum of the forfeiture is plainly disproportionate to any probable damage resulting from the breach of contract. *Id.*

19

at 172. South Carolina Courts hold that purchasers under installment land contracts are entitled to the right of redemption when the forfeiture clause at issue would constitute a penalty. *Id.*

Here, Huggins' scheme was structured so that Grant conveyed him legal title to the Property until the entire repurchase price has been paid, and then Grant was entitled to immediate possession once she exercised her option to repurchase and paid the "costs" associated with the closing. This scheme does include a forfeiture clause, and if it were enforced as Huggins is now attempting, would surely constitute a penalty. Under the protections afforded by South Carolina law related to installment land sale contracts, Grant has a right of redemption in the Property. Grant fully performed her obligations under the Repurchase Agreement, paying Huggins $78,718.00 in monthly payments and $4,223.30 in property taxes, and is entitled to a reconveyance of the Property unencumbered under her right of redemption.

Lastly, with respect to treating the Repurchase Agreement and supporting documents as a lease, there is no evidence to support this position. South Carolina courts have long recognized the difference between a lease containing an option provision and a free-standing option contract. *Ingram v. Kasey's Assocs.,* 340 S.C. 98, 111, 531 S.E.2d 287, 294 (2000) (citing *Conner v. Alvarez,* 285 S.C. 97, 328 S.E.2d 334 (1985)). Additionally, S.C. Code § 30-7-10 requires that for leases greater than a one-year term to be valid so as to affect the rights of subsequent creditors, they must be recorded. Based on the plain language of the Repurchase Agreement

20

drafted by the Plaintiff, it is clear that neither party intended this document to be a lease. Huggins even prevented the Repurchase Agreement from being recorded, which would make the lease invalid as to affecting the rights of subsequent creditors or purchasers for value. The parties' intention at the time of execution evidences that they intended for Grant to remain in the Property and to eventually repurchase it. An argument that the Repurchase Agreement was a lease is additional evidence that the goal of Huggins' predatory scheme was to relieve Grant of her ownership without fair compensation.

## Huggins' Breach of the Repurchase Agreement

In South Carolina, the elements for breach of contract are the existence of a contract, its breach, and the damages caused by such breach. *Hotel & Motel Holdings, LLC v. BJC Enterprises, LLC,* 414 S.C. 635 (2015). Generally, "the breaching party is liable for whatever damages follow as a natural consequence and a proximate result of such breach, however, one who seeks to recover damages for breach of a contract must demonstrate that he has performed his part of the contract, or at least that he was, at the appropriate time, able, ready, and willing to perform it." *Id.*

Here, if the Repurchase Agreement is valid, then Grant has declared her full performance under the agreement and her intention to exercise the option to repurchase the Property. Huggins has breached the Repurchase Agreement by failing to allow Grant to exercise the option to repurchase as provided for in the Repurchase Agreement, or alternatively by failing to honor Grant's right of

21

redemption. Grant attempted to exercise her option to repurchase both informally

through calls to Huggins and formally through her attorney from CHS Pro Bono.

Huggins offered no evidence that he informed Grant that she was in default prior to

receiving the letter from CHS Pro Bono written on Grant's behalf.  Huggins refused

numerous requests from Grant to fulfill his obligation under the Repurchase

Agreement and eventually denied Grant the right to redeem by invoking the

forfeiture clause once Grant consulted with counsel.  Grant has fully performed, and

Huggins has failed to perform, therefore Huggins is in breach of the Repurchase

Agreement.

### The 2016 Addendum to the Repurchase Agreement is Unenforceable

It is well settled that an agreement to do something one was already legally

bound to do is not sufficient consideration to support a new contract. *Rabon v. State

Finance Corp,* 203 S.C. 183, 186-87 (1943). Here, Grant received no new and

independent consideration for the Addendum to the Repurchase Agreement. Under

the Addendum, Grant was to pay an additional $90,000, for which she received

nothing that she did not already have. Huggins testified that the Addendum

allowed Grant's children to pay on and become optionees under the Repurchase

Agreement. However, the Addendum does not provide any language that Grant's

children may become optionees and Grant's family could always have helped her

make monthly payments under the Repurchase Agreement. Huggins also testified

that the Addendum was supported by consideration in that Grant's balloon

payment would stop accruing interest and that the Addendum was a prepayment of

the costs associated with the balloon. The Addendum does not provide any language to that effect, and even if that were true, simply prepaying an existing obligation only benefited Huggins. Clearly, Grant did not receive new and independent consideration to support the Addendum and therefore the Addendum is not a valid contract under South Carolina law and has no legal effect on the Repurchase Agreement.

False Pretenses, False Representations and/or Actual Fraud

In South Carolina, fraud must be shown by clear, cogent, and convincing evidence. *Ardis v. Cox,* 314 S.C. 512 (1993). In order to prove fraud, the following elements must be shown: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury." *Id.*

Here, Huggins engaged in fraud to induce Grant to execute the documents related to this scheme, including the Sale Contract and Repurchase Agreement. Huggins represented to Grant that he would help Grant out of her financial hardships, but in reality, he designed a scheme that would inevitably result in Grant's future default based upon undisclosed terms and conditions, which would have resulted in Huggins acquiring the Property for $1.00. Huggins represented that he would help Grant remain in the Property and to keep her home. Huggins knowingly constructed his scheme that temporarily allowed Grant to remain in the

home, while ownership of the Property would pass to him. Huggins purposefully

failed to disclose the terms and conditions of the option to repurchase from Grant so

that she would just execute his documents and so he could change the terms at his

leisure. Huggins intended for his scheme to be acted upon because he accepted

monthly payments and kept a record of each payment. Throughout their course of

dealings, Grant relied upon Huggins and was unaware of the falsity of his

representations. Grant reasonably relied upon Huggins' representations and

consequently Grant has suffered actual damages. Grant relied upon Huggins'

honesty to her own detriment and has now suffered from Huggins' fraudulent

representations. When Grant failed to default under his scheme, Huggins

approached her with the Addendum, representing to her that she owed him

$30,000.00, and unilaterally raising that amount to $120,000 with no benefit to

Grant.  These acts constitute false representations, false pretenses, or actual fraud

within the meaning of both South Carolina law and 11 U.S.C. § 523.

<u>Exceptions to Discharge</u>

"A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this

title [11 USC §§ 727, 1141, 1192, 1228(a), 1228(b), or 1328(b)] does not discharge an

individual debtor from any debt for property to the extent obtained by false

pretenses, a false representation, or actual fraud, on which the creditor to whom the

debtor is liable for such property reasonably relied, and that the debtor cause to be

made or published with intent to deceive." 11 U.S.C. 523.

24

Huggins obtained the Property and the obligation to reconvey the Property unencumbered through false pretenses, false representations, and/or actual fraud. Huggins was obligated under the Repurchase Agreement to allow Grant the option to repurchase the Property unencumbered. The Property is currently encumbered by a Wells Fargo mortgage of approximately $54,000. Huggins has an obligation to satisfy that debt prior to conveying Grant the Property. Under Huggins' Chapter 13 Plan, he is obligated to pay the debt, but that debt for which Grant has no individual liability encumbers property rightfully owned by Grant. That encumbrance constitutes damages arising directly from Huggins' false representations, statements based upon false pretenses and/or actual fraud, and is a debt excepted from discharge under 11 U.S.C. § 523(a)(2).

## Violation of the S.C. Unfair Trade Practices Act

Pursuant to the South Carolina Code, "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C. Code Ann. § 39-5-20. "If the court finds that the use or employment of the unfair or deceptive method, act or practice was a willful or knowing violation of Section 39-5-20, the court shall award three times the actual damages sustained and may provide such other relief as it deems necessary or proper." S.C. Code Ann. § 39-5-140(a). To recover in an action under the Act, the plaintiff must show (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected the public interest; and (3) the plaintiff suffered monetary or property loss as a result of the

defendant's unfair or deceptive acts. The second element may be satisfied by proof of facts demonstrating the potential for repetition of the defendant's actions. Plaintiffs generally have shown potential for repetition in two ways: (1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence, or (2) by showing the defendant's procedures create a potential for repetition of the unfair and deceptive acts. *Estate of Carr v. Circle S Enterprises,* 379 S.C. 31 (2008). A deceptive act is any act which tends to deceive. Even a truthful statement may be deceptive if it has a capacity or tendency to deceive. Whether an act or practice is unfair or deceptive within the meaning of the Unfair Trade Practices Act depends on the surrounding facts and the impact of the transaction on the marketplace. An act is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive." *Wright v. Craft,* 372 S.C. 1 (2006).

Under the facts presented in this case, it is clear that Huggins engaged in unfair and deceptive acts or practices in his course of dealings with Grant. Huggins testified that he targeted vulnerable properties through searches of the public record and attempted to purchase those homes prior to foreclosure. Huggins testified that he approached approximately 30 different people in this manner. When Huggins approached Grant unsolicited, he found a homeowner who was struggling to keep her home. Instead of offering to purchase the Property for fair market value, Huggins represented that he could help Grant remain in the home if she executed the documents in his real estate scheme. Grant did not have the same

level of formal education as Huggins and justifiably relied upon his representations throughout their course of dealings. After a comprehensive review of Huggins' scheme, it was clearly designed for Grant to fail and never repurchase the Property. Huggins' scheme would inevitably result in a future default based upon undisclosed terms and conditions that only Huggins could define and that he later unilaterally altered. After Grant made 220 consecutive monthly payments under the Repurchase Agreement, Huggins created the Addendum to increase her monthly payments from $219 to $860 per month, adding an additional $90,000 to Grant's obligation. Huggins testified that the Addendum stopped the final balloon payment from continuing to accrue and added Grant's children as optionees. As Grant would still be required to pay the undisclosed and undefined costs of the balloon, paying those costs in advance pursuant to the Addendum does not constitute new and valuable consideration, especially in exchange for an additional $90,000 debt. There is no language in the Addendum that supports a finding that Grant's children were added as optionees under the Repurchase Agreement. The facts make it clear that the scheme devised by Huggins would have an adverse impact on Grant and on the marketplace. Huggins acted in a manner offensive to public policy that is immoral, unethical, and rapacious.

Huggins' real estate scheme affects the public interest because there is a potential for repetition of this unfair and deceptive practice. Huggins testified that he targeted vulnerable homeowners and approached them unsolicited to purchase their homes, which is what he attempted here. Huggins additionally prevented

Grant from recording the Repurchase Agreement, the purpose of which was clearly so Huggins could encumber the Property without other parties' being aware of Grant's interest. Any potential lenders, creditors, or subsequent third-party purchasers at risk, including the banks that gave mortgages to Huggins, would be affected by this deceptive trade practice. Indeed, the prevention of recordation by Huggins allowed him to use the Property as a personal piggy bank, putting Wells Fargo at risk of litigation regarding its mortgage on the Property. Huggins' real estate scheme and transactions with Grant clearly have a potential impact on the marketplace. Huggins conceded at trial that he did not disclose Grant's interest in the Property to either mortgagee or any other party, another intentional act of his scheme. As a result of Huggins' rapacious practices, Grant paid over $82,000 ($78,718 in monthly payments + $4,223.30 in property taxes) to satisfy a debt of approximately $12,000, suffered three years of litigation and the stress of losing her home, and could potentially get a deed back to the Property encumbered by a mortgage of over $54.000.00. Grant was unaware of the super balloon payment until she exercised her option to repurchase and was told that the balloon consisted of more than 20 years-worth of taxes, insurance, and legal fees totaling more than $230,000. Grant could not have known of the super balloon payment in 1998 because the Repurchase Agreement does not contain any language to that effect. Grant has suffered an ascertainable loss as a result of Huggins' employment of unfair and deceptive acts and is therefore entitled to relief under the South

Carolina Unfair Trade Practices Act, allowing for treble damages, costs, and attorney's fees.

Unjust Enrichment

Unjust enrichment is an equitable doctrine, which permits recovery of the amount that the defendant has been unjustly enriched at the expense of the plaintiff. *Chase Home Financial, LLC v. Risher,* 405 S.C. 202 (2013). "One seeking to recover for unjust enrichment must show: (1) a benefit conferred by the plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." *Id.*

Here, Huggins would be unjustly enriched if he was not required to perform under the Repurchase Agreement. Grant conferred unto Huggins both monthly payments in excess of $78,000 and the ability to mortgage the Property. In exchange for these benefits, Huggins paid Grant one dollar. Huggins has realized the benefit given by Grant by taking out multiple mortgages on the Property, from which he received all proceeds, and accepting monthly payments from Grant for over 20 years. It is inequitable for Huggins to now retain the Property after receiving benefits at the expense of Grant. Likewise, it is inequitable for Huggins to deed the Property back to Grant while still encumbered by a mortgage. The equitable solution is to require Huggins to deed the Property back to Grant unencumbered. Huggins would be unjustly enriched if he is not required to pay

Grant the total value of the encumbrance on the Property, as those proceeds were a benefit derived from Grant.

Additionally, Huggins was responsible for property taxes and insurance since 1998 because he was the owner of the Property and was realizing the benefits from encumbering the Property. Grant is not responsible for reimbursing Huggins for property taxes and insurance because she is not the homeowner and has not received any proceeds from the mortgages encumbering the Property. Requiring Grant to offset the costs she paid for the 2017 and 2018 property taxes (totaling $4,223.30) by the amount paid by Huggins since 2019 would constitute unjust enrichment. Huggins would not have been responsible for property taxes and insurance since 2019 if he had not breached the Repurchase Agreement by failing to reconvey the Property.

## Effect of Grant's Chapter 13 Bankruptcy

Plaintiff's main argument for recovery in this proceeding is based primarily upon Grant's failure to assume the Repurchase Agreement in her Chapter 13 case. This Court has determined that options to purchase or retail installment contracts, similar to the Repurchase Agreement, should be treated as executory contracts and are required to be either rejected or assumed pursuant to 11. U.S.C. § 365. *In re Kingsmore*, 295 B.R. 812, 826 (Bankr. D.S.C. 2002). The Bankruptcy Code provides that the rejection of an executory contract constitutes a breach of the contract, not contract termination. 11 U.S.C. § 365(g). The Bankruptcy Code also provides that an ipso facto clause, like the terms in the Repurchase Agreement, cannot be used to

terminate or modify a contract solely because the debtor filed bankruptcy. 11 U.S.C.
§365(e)(1).

Here, Grant's Chapter 13 bankruptcy used form language which provided
that any executory contracts not listed were deemed rejected. Grant did not list the
Repurchase Agreement as an executory contract to be assumed, and therefore the
Repurchase Agreement was deemed rejected under the language of the form
Chapter 13 Plan. A rejected executory contract constitutes breach of the contract,
not termination of the contract. Although Grant's failure to assume the Repurchase
Agreement in her Chapter 13 constituted a technical breach under the Bankruptcy
Code, the breach was immaterial because (1) Grant was not in default under the
Repurchase Agreement at time of filing the petition and there was no default to be
cured; (2) Grant continued to perform under the Repurchase Agreement throughout
the life of her bankruptcy plan; (3) Huggins continued to accept payments during
Grant's bankruptcy; and (4) Huggins did not incur any damages as a result. Grant
was current on her obligations as of the petition date and remained current
throughout the life of her confirmed plan. Grant's Chapter 13 Bankruptcy filing had
no impact on the Repurchase Agreement as the parties' rights rode through the
bankruptcy unimpaired.[4]

Additionally, this Court has held that a creditor is bound to a confirmed
chapter 13 plan only when proper notice is given, and the creditor fails to object to a
debtor's plan. See *In re Durham*, 260 B.R. 383, 390-392 (Bankr. D.S.C. 2001)

---

[4] Interestingly, Huggins approached Grant with the Addendum seeking to increase the payment and
the ultimate amount of her liability under the Repurchase Agreement while her Chapter 13 case was
pending.

(finding that whether the creditor received adequate notice that its rights would be modified by the plan's treatment was pivotal in determining whether confirmed plan is binding on creditor). Here, even if the confirmed plan had proposed a change of treatment, Huggins was not provided notice of the proposed chapter 13 plan and would therefore not be bound by the confirmed plan. Since the confirmed plan neither modifies the treatment of Huggins' rights under the Repurchase Agreement nor would be binding on Huggins, then the confirmed plan has no effect on the Repurchase Agreement.

Judicial Estoppel

Plaintiff maintains that Grant's failure to assume the executory contract in her 2013 bankruptcy filing now estops Grant from asserting her interest in the Property. Judicial Estoppel "prevents a litigant from asserting a position inconsistent with, or in conflict with, one the litigant has previously asserted in the same or related proceeding." *Cothran v. Brown*, 357 S.C. 210, 215, 592 S.E.2d 629, 631 (2004). The elements of judicial estoppel are (1) two inconsistent positions taken by the same party; (2) the positions must be taken in the same or related proceedings involving the same party; (3) the party must have been successful in maintaining that position and received some benefit; (4) the inconsistency must be part of an intentional effort to mislead the court; **and** (5) the two positions must be totally inconsistent. *Id.* At 215-216, 592 S.E.2d. at 632. (Emphasis added). The purpose of judicial estoppel is to preserve the truth-seeking function of the judiciary. *Id.* At 216, 592 S.E.2d at 632; *Quinn v. Sharon Corp.*, 343 S.C. 411, 415,

540 S.E.2d 474, 475-76 (Ct. App. 2000). Judicial estoppel is discretionary and

"should be applied sparingly, with clear regard for the facts of the particular case."

*Cothran*, 357 S.C. at 216. Judicial estoppel will not be applied "where to do so would

work an injustice against the party being estopped while simultaneously subverting

the judicial process." *Hawkins v. Bruno Yacht Sales, Inc.*, 342 S.C. 352, 368, 536

S.E.2d 698, 706 (Ct. App. 2000) (internal citations omitted).

Here, the elements of judicial estoppel are not met, and to enforce an estoppel

would subvert the judicial process. Failing to assert an interest in a form chapter 13

bankruptcy plan, especially considering the ambiguous nature of the transaction

involved here, is easily distinguishable from a defendant expressly asserting to have

no interest in property.  As to the first element, Plaintiff argues that Grant's first

representation in her bankruptcy case was that she had no ownership interest in

real property.  However, the schedules clearly indicate that she had a monthly

obligation of "$219 for rent or mortgage payment."  Plaintiff sought to illicit

testimony from Grant that she lied as to her interest in the Property.  However,

based upon the general warranty deed offered into evidence, Grant did not own the

property at the time of the Bankruptcy. Grant testified that she was confused about

the status of her ownership as a result of Huggins' ambiguous scheme. Grant did

have a future right to repurchase the Property under the terms of the Repurchase

Agreement but at the time of filing was not the owner.  It was Huggins, not Grant,

who prevented a public record of the interest arising under the Repurchase

Agreement from being made known to creditors. Grant has now both fully

performed and attempted to exercise her option to repurchase the Property. Grant's

conduct in her Chapter 13 bankruptcy case is not inconsistent with her current

position. Grant asserts that she has a right under the Repurchase Agreement to

now exercise her option to repurchase or alternatively to exercise her right of

redemption. These positions are clearly not inconsistent.

As to the second element, the 2013 bankruptcy filing did not include Huggins

as a creditor and therefore he was not party to the proceeding. Although it was

Grant who failed to include Huggins, Grant did not alter the terms of the contract,

was current on her obligations to Huggins, and therefore Huggins was unaffected by

the filing. Huggins, as owner of the Property, asks the Court to now penalize Grant

for failing to assert that she was also the owner of the Property. Similarly, as to the

third element, Grant did not receive a meaningful benefit from failing to list her

interest in the Property. Although Plaintiff asserted that creditors would have been

entitled to a current dividend based on the future value of Grant's interest in the

Property, no evidence was provided as to the value of Grant's future interest. No

evidence was presented that a detriment existed to any such creditor as a result of

any statement or position taken by Grant in the chapter 13 case.

As to the fourth element, there is no evidence that Grant's alleged

inconsistency was intentionally done to mislead the Court. Evidence before the

Court demonstrates that the ambiguity of the documents related to Huggins'

scheme created Grant's confusion and lack of understanding of her interest in the

Property. Grant honestly listed her $219 monthly payment on her schedules and

34

there is no evidence Grant intended to conceal information from the Court. Any confusion by Grant as to her interest was a direct result of drafting of the documents provided by Huggins, and was not done intentionally to mislead the Court. As to the fifth element and as stated previously, Grant's two positions are not totally inconsistent. Grant first asserted that she had $219 monthly rent or mortgage payments, but no interest in real estate, and now Grant asserts that she has fully performed her obligations under the contract and can now exercise her option to repurchase the Property. All five elements of judicial estoppel have not been met.

Ultimately, an application of Judicial Estoppel in this case would impede the truth-seeking function of this Court, thereby subverting the important function to which the doctrine of judicial estoppel seeks to protect. To prevent Grant from asserting an equitable mortgage in the Property because she failed to list her executory contract in a 2013 bankruptcy filing would work an injustice against the party being estopped. The facts of this specific case raise worrisome questions regarding Huggins' attempt to fraudulently obtain the Property from Grant through unfair and deceptive trade practices. Huggins drafted ambiguous documents that this Court and many capable attorneys are still attempting to decipher. Huggins prepared the document which guaranteed that the Repurchase Agreement would not be recorded. Huggins now seeks to have the Court estop Grant from exposing his predatory real estate scheme on the basis that Grant misunderstood the same ambiguous documents that Huggins drafted. Estopping Grant from taking the

position that she holds a valid interest in the Property would prevent the Court from ascertaining the true nature of the parties' transaction ensuring that justice is served.

Similarly, the Plaintiff's collateral estoppel argument fails as well. Collateral estoppel bars re-litigation of an issue when (1) it is the same issue; (2) the issue was actually litigated; (3) the issue was determined by a valid and final judgment; and (4) the determination was essential to the prior judgment. *McNaughton-McKay Elec. Co. of N.C., Inc. v. Aldrich*, 324 S.C. 275, 279, 482 S.E.2d 564, 566-67 (Ct. App. 1997). The Supreme Court of South Carolina adopted the Restatement (Second) of Judgments Sections 27, 28, and 29 in *South Carolina Property and Cas. Ins. Guarn. Ass'n v. Wal-Mart Stores, Inc.*, 304 S.C. 210, 213, 403 S.E.2d 625, 627 (1991).

Huggins' assertion that collateral estoppel applies to this situation simply does not match the facts. Grant's chapter 13 bankruptcy (1) did not include the issue of an equitable mortgage; (2) never litigated the character of the Repurchase Agreement; (3) the final decree granting a discharge was not a determination of a potential equitable mortgage; and (4) the character of the Repurchase Agreement was not an essential determination in the final decree granting Grant a discharge. Conversely, Huggins has previously asserted both judicial and collateral estoppel of this exact matter in a summary judgment motion which was considered by the State Court and denied when the matter was set for trial on the very issues Huggins now seeks to have this Court disregard.

## Plaintiff's Additional Defenses

Pursuant to Rule 8(c) of the South Carolina Rules of Civil Procedure, "a party shall set forth affirmatively" in their responsive pleading a statute of limitations defense. If a party fails to do so, such an affirmative defense is waived. In his responsive pleading filed June 1, 2021, Plaintiff raised just two affirmative defenses: failure to state a claim pursuant to rule 12(b)(6) and the doctrine of laches. Because Plaintiff never explicitly set forth a statute of limitations defense, such a defense is waived.  Additionally, any Statute of limitations defense is inapplicable because this is an equitable action. *Thomerson v. DeVito*, 430 S.C. 246, (2020).

Alternatively, in South Carolina, the discovery rule provides that the statute of limitations does not begin to run until a cause of action reasonably ought to have been discovered. *Ray v. City of Rock Hill*, 434 S.C. 39, 48-49 (2021). If the facts and circumstances indicate the party discovered or could have discovered the wrongdoing through the exercise of ordinary care and reasonable diligence, the statute of limitations applies. *Pers. Care, Inc. v. Theos*, 426 S.C. 78, 89 (2019) (citing *Burgess v. Am. Cancer Soc., S.C. Div., Inc.*, 300 S.C. 182, 185, 386 S.E.2d 798, 799 (Ct. App. 1989)). Here, Grant did not discover Huggins' wrongdoing until he refused to honor his obligations under the Repurchase Agreement in 2019. Furthermore, Grant was unaware of the undisclosed and undefined "costs" associated with exercising her option to repurchase, which gave rise to these causes of action, until Huggins asserted she owed an additional $230,000 to repurchase. Grant and

Huggins have been in litigation since 2020 and therefore the Statute of Limitations and Laches arguments do not apply.

Lastly, Plaintiff's request for possession of the Property under the Residential Landlord and Tenant Act and alternatively for foreclosure of Grant's interest are not available remedies since Huggins has apparently abandoned his assertion that the Repurchase Agreement is a lease.  Moreover, the Court has determined that the Repurchase Agreement is an equitable mortgage and Grant has fully performed her obligations under the Repurchase Agreement.

## CONCLUSION

For the reasons set forth herein, the Court finds that: (1) the Repurchase Agreement together with the scheme comprised of various documents signed by the parties simultaneously with or in connection with the Repurchase Agreement is per se unconscionable and the Plaintiff cannot pursue its eviction cause of action; (2) the Repurchase Agreement constitutes and Equitable Mortgage whereby Grant has an equitable interest in the Property; (3) Grant has fully performed under the Repurchase Agreement, paying Huggins $78,718.00 in monthly payments and $4,223.30 in property taxes; (4) Grant has properly exercised her option to repurchase; (5) Huggins breached the Repurchase Agreement by failing to honor Grant's option to repurchase and by failing to reconvey the Property unencumbered; (6) the Addendum is unenforceable as there was no new or independent consideration; (7) Huggins' statements and actions constitute false pretenses, false representations and/or actual fraud by knowingly making false material

statements, failing to disclose material terms known only to him, for the purpose of inducing Grant to execute the Sale Contract and Repurchase Agreement upon which Grant reasonably relied to her detriment; (7) any damages sustained by Grant resulting from Huggins' fraudulent acts are excepted from discharge pursuant to 11 U.S.C. § 523(a)(2); (8) Huggins' actions violated the South Carolina Unfair Trade Practices Act by conducting unfair and deceptive trade practices affecting the public interest and that caused Grant to suffer actual damages; (9) Huggins failure to reconvey the Property unencumbered would constitute unjust enrichment for Huggins; and (10) upon the re-conveyance of the Property to Grant, any amount of mortgage still encumbering the Property constitutes actual damages to Grant and is subject to trebling.

THEREFORE, IT IS HEREBY ORDERED for the reasons herein stated that:

1. Plaintiff's claim for eviction and possession pursuant to South Carolina's Residential Landlord and Tenant Act is dismissed;

2. Plaintiff's claim for foreclosure of Grant's interest in the Property is dismissed;

3. Plaintiff's claim for breach of contract by Grant is dismissed;

4. Plaintiff's claim for estoppel, both judicial and collateral, is dismissed;

5. Plaintiff is directed to convey the Property by general warranty deed to the Defendant immediately – the costs of which are to be borne by Plaintiff;

6.  Plaintiff is directed to obtain a release of the mortgage lien on the Property from Wells Fargo;

7.  Plaintiff shall amend his chapter 13 plan to provide for a claim to the Defendant in the amount of the total mortgage lien encumbering the Property, plus any and all interest accruing thereon;

8.  Defendant is entitled to treble any and all damages owed from Plaintiff and may recover reasonable attorney's fees and costs as a result of Plaintiff's unfair and deceptive actions in violation of the South Carolina Unfair Trade Practices Act § 39-5-140(a);

9.  The case is remanded to the Charleston County Master-in-Equity for a determination of the damages, costs, and fees due to the Defendant from Plaintiff.

IT IS SO ORDERED.