## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re, <br><br> Scott Matthew Huggins, <br><br><div align="right">Debtor(s).</div> <hr> Scott Matthew Huggins, <br><br><div align="right">Plaintiff(s),</div> <br> v. <br><br> Louise Coleman Grant, <br><br><div align="right">Defendant(s).</div> | C/A No. 23-00184-EG <br><br> Adv. Pro. No. 23-80013-EG <br><br> Chapter 13 <br><br> **ORDER AND MEMORANDUM OPINION** |

      **THIS MATTER** is before the Court on the Amended Complaint filed by Scott Matthew Huggins ("Huggins") against Louise Coleman Grant ("Grant").[1] This action was initially filed in the South Carolina Court of Common Pleas in 2020, Case No. 2020-CP-10-03614, but was removed to this Court by the Notice of Removal filed on February 22, 2023.[2] Grant consented to the removal of the action to this Court.[3] Removal is proper under Fed. R. Bankr. P. 9027 and 28 U.S.C. § 1452(a). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157, and 1452. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (K), and (O).

      This adversary proceeding arises from a real estate transaction that took place 26 years ago between the parties—in January of 1998—regarding property at 89 America Street in Charleston, South Carolina ("the Property"), where Grant currently resides. The issue boils down to a simple question: Who is the current owner of the Property? The answer, however, is not as simple and

---

[1] ECF No. 11, filed Apr. 14, 2023. Unless otherwise specified herein, all references to the ECF docket shall refer to documents filed in this adversary proceeding (Adv. Pro. No. 23-80013-EG).
[2] ECF No. 1.
[3] Answer to Amended Complaint, ECF No. 19, filed Apr. 27, 2023.

can only be reached after sifting through numerous legal and evidentiary issues. In the Amended

Complaint,[4] Huggins alleges causes of action for (1) possession under S.C. Code Ann. § 27-40-

10, (2) foreclosure, (3) breach of contract, and (4) estoppel. Grant filed an Answer and

Counterclaims (the "Answer"),[5] alleging the following affirmative defenses (the "Affirmative

Defenses"): equitable doctrines of unclean hands, duress, laches, estoppel, and/or waiver;

collateral estoppel/res judicata; offset; unauthorized practice of law; violations of the Realtor's

Code of Ethics and Standards of Practice; payment; lack of consideration; fraud; and prior breach.

In the Answer, Grant also alleges the following counterclaims: (a) false pretenses, false

representations, or actual fraud; (b) violation of the South Carolina Unfair Trade Practices Act; (c)

breach of contract; (d) declaration of equitable mortgage; and (e) unjust enrichment (the

"Counterclaims"). On June 23, 2023, the parties submitted a joint pre-trial order which was

entered by the Court, stipulating to various facts.[6] The parties attempted to resolve their claims

through mediation but were unsuccessful. After the conclusion of a two-day trial, the Court took

the matter under advisement.

The Court entered an Amended Consent Scheduling Order on April 14, 2023, which

provided that "[t]o the extent there is any dispute amongst the parties as to whether the entry of

final orders or judgments by this Court on any issue in this adversary proceeding or to the extent

that a party wants to seek withdrawal of the reference or a motion for abstention, any such motion

should be filed by April 29, 2023."[7] No motion was filed by that deadline. In her Answer, Grant

agreed that this matter is properly before the Court, that the Court has jurisdiction over the claims

---

[4] The Court entered a Consent Scheduling Order on April 4, 2023, wherein the parties agreed, among other things, to amend their pleadings and that no further discovery would be conducted. ECF No. 9.
[5] ECF No. 19, filed Apr. 27, 2023.
[6] ECF No. 28.
[7] ECF No. 14.

and this Adversary Proceeding, and that this is a core proceeding that is related to Huggins'

bankruptcy case.  Accordingly, the Court may enter final orders or judgments in this adversary

proceeding.

Based upon the findings of fact and conclusions of law set forth below, the Court finds in

favor of Grant and dismisses Huggins' claims.[8]

## FINDINGS OF FACT

### THE PROPERTY

Grant and her late husband, Andrew Grant, purchased the Property in 1973 and acquired

title as co-owners.  The Property was encumbered by a Veterans Administration mortgage loan

held by Fleet Mortgage Corp. (the "Fleet Mortgage"), with an original principal balance of

$20,450.00 at an interest rate of 7.00%.  Under the Fleet Mortgage, the Grants were to pay $136.20

per month for 360 months, with a maturity date of June 2003.[9]  Grant testified that at the time of

the purchase of the Property, she and her husband were separated, and he never resided there.

Grant has continuously resided in the Property since 1973 and made payments  on the Fleet

Mortgage, building up significant equity.  Grant's eight children also resided in the Property until

they finished school and moved out.

On September 13, 1996, Andrew Grant passed away.  Grant and her husband never

formally divorced.  At the time of his death, Mr. Grant was apparently living with his second wife,

Stella Grant, in McClellanville, South Carolina.  Mr. Grant's death created a cloud on the title to

the Property due to his heirs' claims to it.

---

[8] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and vice
versa.  The findings of fact and conclusions of law set forth herein are made pursuant to Fed. R. Civ. P. 52, which is
made applicable to this proceeding under Fed. R. Bankr. P. 7052.
[9] Def. Exs. A, D, and E.

<u>FORECLOSURE ACTION</u>

Grant defaulted on the mortgage in June of 1997.  On or about December 18, 1997, Fleet

Mortgage Corp. filed a lawsuit in Charleston County seeking to foreclose its mortgage on the

Property, Case No. 97-CP-10-5667 (the "Foreclosure Action").[10]  At the time of the Foreclosure

Action, the Fleet Mortgage could have been reinstated by payment of $4,922.90 and could have

been paid in full for $7,961.34 plus interest and other costs.[11]  Property tax records from 1998

reflect that the Property had an appraised value of approximately $57,400.00.[12]  Accordingly, it

appears that Grant had equity in the Property of approximately $50,000.00.

In 1997, Huggins was 24 years old and was attending school for a post-secondary degree

and working in the medical field in Charleston, SC.  He became interested in pursuing real estate

investments by targeting distressed homes facing foreclosure actions. While he eventually

obtained a post-graduate degree and real estate license, in 1997 he was not yet licensed as a real

estate agent or broker and had never made any prior real estate deals.  Huggins testified that in

December of 1997 he went to the Clerk of Court for Charleston County and pulled multiple

foreclosure files from the court's records to look for possible investment opportunities.  He then

knocked on the doors of approximately 30 different properties he had identified.  In December

1997 or early January 1998, he approached Grant at her home, unsolicited, and offered to help her

save the Property from foreclosure.  At that time, Grant was approximately 51 years old and was

working at a local hospital sterilizing surgical instruments.  Grant testified that she welcomed

Huggins' assistance because she was reluctant to ask her children for help.  She had planned to ask

some family members for financial assistance, but before she reached out to her extended family,

---

[10] Def. Ex. A.
[11] *Id.*
[12] Pl. Ex. 16

Huggins came to her home and offered to help pay off the Fleet Mortgage in exchange for payments of $219 per month.

The parties offered somewhat different accounts of the nature of the meeting and the discussions that took place—recollections that may have been affected by the passage of 26 years. Huggins testified that he did not recall whether Grant agreed to sell the Property at the initial meeting. He further testified that he wanted to help Grant with her financial hardship and resolve the pending foreclosure of the Property. Grant testified that Huggins stated he was "her guardian angel, the Lord sent me here because I see you in trouble." Grant thought she could trust Huggins because he looked like a "church man . . . somebody you could trust." She stated she met alone with Huggins at the initial meeting and that he told her he was there to help because her Property was in foreclosure. She testified that Huggins said that he would pay off the bank, and she could then pay him back. She also testified that when she inquired if they needed a lawyer, he said he would deal with that.

THE SALE CONTRACT, OPTION AGREEMENT & RELATED PROPERTY TRANSFERS

Due to the cloud on the Property's title caused by her husband's death, Huggins told Grant that she needed to obtain quit claim deeds from Mr. Grant's heirs so that she would have clear title to the Property. On January 9, 1998, Mr. Grant's heirs executed six Quit Claim Deeds transferring partial title to the Property to Grant.[13] Each of the six executed quit claim deeds included Huggins' mailing address for delivery after recording.

---

[13] *See* Def. Exs. F. through K, which were all recorded in the Charleston County Register on February 3, 1998. It is unclear who prepared the quit claim deeds. Grant testified that she did not prepare the deeds, while Huggins testified that he could not remember who prepared them. It does not appear that an attorney was engaged to prepare the deeds. .

On January 13, 1998, Huggins and Grant entered into a "Real Estate Sale Contract." (the

"1998 Contract").[14]  The 1998 Contract was prepared by Huggins and presented to Grant.  The

1998 Contract, with Grant being the "Seller" and Huggins the "Buyer", was signed by both parties

and provided, in pertinent part:

> That for and in consideration of $1.00 (one dollar and no cents) cash in hand paid
> at the time of signing of this contract, receipt of which is acknowledged by the
> sellers (as evidenced by their signatures hereon) together with the assumption
> hereinafter mentioned, the sellers agree to grant, sell and convey by general
> warranty deed the following described real property located in: Lot 30, Block
> ABCDA, Plat Q, Subdivision 89 America Street, TMS No. 459-05-04-021, County
> Charleston, Address 89 America Street, City Charleston, South Carolina, Zip 29403
> . . . .
>
> The buyers agree to purchase the property subject to an outstanding mortgage in
> the amount of approximately $7,961.34 as of June 1, 1997 payable to Fleet
> Mortgage Corp. in monthly installments of $136.20 including principal, interest (at
> 7%), tax and insurance. . . .
>
> It is further agreed that the buyers will pay all costs necessary to bring the herein
> referred to mortgage current including interest payments, late charges, abstract
> costs, court costs, and attorney's fees up to but not to exceed $4,500.
> . . .
>
> Sellers fully understand and agree that by the execution hereof and its acceptance
> of the consideration stated above, the real property herein described is legally sold
> and the buyer shall own the said property subject only to the mortgage stated herein.
> . . .
>
> The possession of the herein described real estate shall be given to the buyer(s)
> Scott Huggins.  Seller to occupy premises as an optionee, according to terms of the
> option agreement executed with the deed.
>
> Additional Provisions:
>
> This offer is subject to the approval of my attorney.  This contract is subject to
> buyer being able to save seller from foreclosure.  Buyer can request deed from seller
> at any time.  Buyer reserves the right to assign this contract.  Buyers to pay
> liquidated damages in the amount of Twenty-Five-Hundred Dollars, in addition to
> attorney's fees and other court cost including but not limited to filing fees, sheriff's
> service, and out of pocket expenses.

---

[14] Pl. Ex. 2.

Both sellers and buyers agree that this written contract constitutes the entire agreement between the parties and that there are no other agreements or understanding except as mentioned herein.  The undersigned has read and fully understands this agreement.

Grant and Huggins also executed an "Option to Repurchase Agreement" (the "Option Agreement") on the same day they executed the 1998 Contract.[15]  The Option Agreement, with Grant as "Buyer" and Huggins as "Seller", provided, in pertinent part:

That the seller, for and in consideration of the sum of $1.00 (one dollar and no cents) in hand paid by the buyers and subject to all conditions stated herein, hereby given [sic] to the buyer the privilege of purchasing on or before February 2028 the following described real property situated in Charleston County, SC:
Address 89 America Street, Lot 30, Subdivision 89 America Street, Block ABCDA, Plat Q, Page 20.

It is further agreed that the sellers give the buyers the right to occupy the herein described premises subject to the following terms, stipulations and conditions to wit:

The buyers shall pay to the sellers the amount as follows:
$219 per month beginning on the 15th day of February, 1998 and $219 to be paid on or before the 15th day of each of the 360 following months.  No partial payments accepted/no prepayment accepted unless for the full term of this contract. . . .

It is further agreed that if the buyers fulfill all the terms, conditions and stipulations mentioned herein before, the sellers give the buyers the right to purchase the herein described real estate for the sum of $10 (ten dollars) plus all closing costs and other expenses incidental to the purchase of aforesaid real estate including, but not limited to maintenance costs, improvement costs, and legal fees and subject to an existing mortgage in favor of Fleet Mortgage Corp. which balance was approximately $7,961.34 on January   [sic], 1998.

This instrument shall not be recorded and the buyers agree that each payment herein stated will be made to the sellers on or before the dates required or should the buyers fail to perform as herein agreed, this contract is null and void and has no further effect and the buyers shall have 3 days after such failure to vacate the herein described real estate and leave the same in good condition as it is on the date of signing this agreement.

In case the privilege of purchase hereby given is not exercised and the conditions herein fully performed by the buyers and written notice of such exercise and

---

[15] Pl. Ex. 1.

performance given to the sellers on or before said privilege and exercise shall there upon wholly cease but no liability to refund the money paid therefore shall arise and this instrument shall at once be surrendered to the sellers for cancellation.

The buyers agree to maintain the property in good condition and repair and it is further agreed that the buyer must obtain permission from the sellers before making any addition or improvements to the property including but not limited to painting, carpentry and/or other types of construction work.

It is further agreed that the sellers shall have the right to sell, assign, mortgage, lease or otherwise encumber said real estate subject to this option.

This constitutes an agreement in entirety between the parties.

The Option Agreement, which was not recorded, required Grant to make regular monthly payments of $219.00 to Huggins, beginning February 15, 1998, and continuing for 360 months. Huggins' interpretation of the Option Agreement is that it allowed Grant to repurchase the Property at any time upon payment in full of all monthly payments required under the agreement (*i.e.*, $219.00 x 360 months = $78,840.00), **plus** any expenses he had incurred related to the Property, including taxes, insurance, maintenance, and legal costs. His understanding was that if Grant did not exercise the option, she would not get a refund of the amounts paid. On the other hand, Grant's understanding was that once she completed making the monthly payments under the Option Agreement, she could have the Property back for $10 "plus costs incidental to the closing," which she believed meant costs for the execution and recording of a deed back to her. According to Grant's testimony, Huggins did not explain to her that she would be responsible for other expenses.

Grant testified that she did not intend to sell her property to Huggins for $1.00 and would not have agreed to do so. On direct examination, when asked whether she understood that the 1998 Contract was her agreeing to sell her house to Huggins subject to the Option Agreement, she stated: "I don't know what it meant but I would never sell my house." Huggins, on the other hand,

believed he owned the Property as a result of the transaction and that the Option Agreement was a lease with an option to repurchase the Property.

Grant identified and confirmed her signature on the Option Agreement during direct examination, but then later denied the signature on this document. When her counsel asked her to read the title of the Option Agreement, she misread the title as "Opportunity to repurchase agreement."[16] Her counsel also asked her to read portions of the Option Agreement aloud, which she did with some difficulty—misreading several words. [17] Grant testified that she could not recall whether she had read the Option Agreement before signing it. Notably, no attorney was present when the parties executed either the 1998 Contract or Option Agreement. Huggins testified he prepared the 1998 Contract and Option Agreement using forms he received in a real estate course he had attended.

On January 13, 1998, the same date the 1998 Contract and the Option Agreement were entered into, Huggins received a letter from Rogers Townsend & Thomas, PC law firm, counsel for Fleet Mortgage Corp. in the Foreclosure Action, advising him that "[p]ursuant to a specific request, the total necessary to reinstate the above referenced loan before January 23, 1998, will be the amount of $4,922.90."[18] Huggins did not reinstate the loan by that deadline.

On February 9, 1998, a Deed of Distribution from the estate of Andrew Grant, Grant's husband, was executed by his personal representative, Stella Grant, transferring Mr. Grant's interest in the Property to Grant—the Defendant in this proceeding.[19] Huggins served as a witness

---

[16] Grant repeatedly misread "option" as "opportunity" during her testimony. While the record reflects Grant has an eighth-grade education, based on her apparent difficulty in reading legal documents at issue in this case, the Court not only questions her reading skills now and at the time of the transaction, but even more so her ability to comprehend the legal implications of the documents, which are not clear even to the lawyers involved in this dispute.

[17] Grant's counsel confirmed that Grant was not contesting the validity of the signatures on the 1998 Contract and Option Agreement and indicated that Grant was merely confused when reviewing these documents with counsel.

[18] Def. Ex. D.

[19] Def. Ex. L, recorded in Book D297 at Page 381 in the Charleston County Register.

to the Deed of Distribution.  The Deed of Distribution was recorded in the Charleston County Register on February 12, 1998.  On February 16, 1998, Grant executed a Quit Claim Deed transferring her interest in the Property to Huggins "for and in consideration of the sum of $1."[20] According to the Affidavit attached to the Quit Claim Deed, the Property was being transferred subject to a lien or encumbrance in the amount of $7,961.34.  The Quit Claim Deed was recorded on February 17, 1998.

## LIENS ON THE PROPERTY

In March of 1998, Huggins obtained a payoff quote from counsel for Fleet Mortgage Corp. in the amount of $11,985.68, good through March 13, 1998.[21]  At some point following receipt of the payoff letter, Huggins paid off the Fleet Mortgage.  Huggins testified that he borrowed the money to pay off the Fleet Mortgage from a family member.  Fleet Mortgage Corp. subsequently dismissed the Foreclosure Action against Grant by filing a Stipulation of Dismissal and Notice of Cancellation of *Lis Pendens* on June 22, 1998.[22]

On July 23, 1998, Grant executed a General Warranty Deed to Huggins for the Property,[23] which was prepared by Steven M. Rubenstein, an attorney.  The General Warranty Deed indicates that it is a "corrective deed" being executed to "affirm the conveyance of the real property to [Huggins]" because "the deed recorded at Book J297 at Page 458 was improperly executed."  Huggins sought the General Warranty Deed from Grant because he wanted to take out a loan secured by the Property and the bank required him to have a General Warranty Deed to close.[24] On July 28, 1998, Mr. Rubenstein conducted a mortgage loan closing for Huggins, whereby

---

[20] Pl. Ex. 27, recorded in Book J297 at Page 458 in the Charleston County Register.
[21] Pl. Ex. 4.
[22] Pl. Ex. 5.
[23] Pl. Ex. 6.
[24] The 1998 Contract also provided that Grant was obligated to deliver a general warranty deed within nine months of the execution of the Contract.

Huggins borrowed $25,000.47 from NationsCredit, with the Property serving as collateral for the loan.[25] The purpose of the loan was to reimburse him for the funds paid to get the Property out of foreclosure, which he borrowed from a family member. He testified that Grant did not have any obligation to repay this loan. Huggins testified that NationsCredit conducted an appraisal of the Property around the time of the closing, and the Property appraised at $56,000.00.

In November of 2001, Huggins received a loan of $56,000.00 from Wachovia Bank, secured by a mortgage on the Property, which was recorded on December 4, 2001.[26] As a condition of receiving this loan, Huggins testified that he was required to obtain flood insurance on the Property. Utilizing a portion of the proceeds from the Wachovia Bank loan, Huggins satisfied the NationsCredit mortgage on December 19, 2001.[27]

<u>GRANT'S CHAPTER 13 BANKRUPTCY CASE</u>

In 2011, Grant became ill and was forced to retire from her job at the hospital. After retirement, Grant's only source of income was her Social Security benefits, and she began to experience financial difficulties again. To address her debts, Grant filed a Chapter 13 bankruptcy petition along with schedules on April 15, 2013.[28] Grant's bankruptcy schedules indicate her address at the time of filing was the Property's address. While Grant listed a monthly "Rent or home mortgage payment" on Schedule J – Current Expenditures of Individual Debtors – in the amount of $219.00,[29] she did not list Huggins as a creditor in her bankruptcy case nor did she list ownership of the Property on her Schedule A – Real Property.[30] Schedule G – Executory Contracts and Unexpired Leases – similarly did not list any lease.[31] Huggins did not receive notice of Grant's

---

[25] Def. Ex. EE. Huggins received a disbursement of $23,905.47 from this closing.
[26] Def. Ex. JJ.
[27] Joint Pretrial Order, ECF No. 28, at p. 6.
[28] Pl. Ex. 9. Grant's bankruptcy case was assigned C/A No. 13-02221.
[29] *Id.*, p. 22.
[30] *Id.*, p. 8.
[31] Pl. Ex. 9, p. 19.

bankruptcy case. During her § 341 meeting of creditors, when questioned by the Chapter 13 trustee

as to whether she owned any real property, Grant answered she did not.[32]  When asked if she listed

all of her assets and all of her creditors in her schedules, Grant answered that she had.[33]  Grant

testified at trial that she did not include Huggins or the Property in the bankruptcy because "the

bankruptcy had nothing to do with the house."

Grant's Chapter 13 plan, which was confirmed on June 7, 2013, provided for monthly

payments to the Trustee of $115.00 per month for 38 months.  It did not propose to pay unsecured

claims in full, did not provide for payment of any debt to Huggins, and did not list any leases or

executory contracts to be assumed. [34]  The confirmed plan further provided that "[a]ny executory

contract or unexpired lease not specifically mentioned [in the plan] is rejected."[35]  Grant, however,

was current with her payments to Huggins at the time she filed her bankruptcy case and continued

to make her monthly payment to him throughout her bankruptcy case.  Grant successfully

completed payments under her Chapter 13 plan and received a discharge on August 23, 2016.[36]

Her general unsecured creditors, which had asserted proofs of claim totaling $6,476.37, received

distributions of $1,154.77[37]—or approximately 18% recovery on their claims.  Her case was closed

on September 2, 2016.[38]

<u>THE PARTIES' PERFORMANCE UNDER THE OPTION AGREEMENT</u>

From February of 1998 through July of 2016, Grant timely made each of her monthly

payments of $219.00 to Huggins, totaling $48,618.00, never missing a payment.[39]  While Huggins

---

[32] Pl. Ex. 11.
[33] *Id*.
[34] Pl. Ex. 10.
[35] *Id.*
[36] C/A No. 13-02221-jw, ECF No. 22.
[37] C/A No. 13-02221-jw, ECF No. 24.
[38] C/A No. 13-02221-jw, ECF No. 25.
[39] On October 15, 1998—the day the payment was due—Huggins sent Grant a letter by certified mail informing her
of a "rental default."  However, Huggins ultimately received the October 1998 payment, and it appears that he has

testified that he visited the Property a couple of times between February of 1998 and June of 2016 for "insurance inspections," Grant testified she never saw or spoke to Huggins during that time and that Huggins never did any maintenance on the Property.  Grant bore the costs of maintaining the Property, including repainting, electrical, plumbing, and roof repairs.

Huggins testified that he paid the taxes and insurance on the Property from 1998 through 2016 and presented copies of property tax bills and insurance policies for the Property into evidence.[40]  Grant, however, was not aware that Huggins was paying taxes and insurance on the Property.  From the record before the Court, it appears that Grant's taxes and insurance were escrowed by Fleet Mortgage prior to the transaction with Huggins, so it is not surprising that Grant lacked knowledge that Huggins was paying taxes and insurance.  Given her testimony, it is apparent that Grant was confused about the nature of her legal interest in the Property from 1998 until around 2016.  She believed she owned the Property during that time period, but also testified that she "didn't own the house [at the time of the bankruptcy], I didn't finish pay for it so why should I, um, list that."

<u>2016 AMENDMENT</u>

In June 2016, Huggins called Grant to set up an appointment to meet about the Property. At the time of their meeting, Grant had 139 payments of $219.00 remaining under the 1998 Contract—totaling approximately $30,441.00.[41]  Huggins testified that he set up the meeting because the costs of taxes and insurance on the Property had escalated over the years and Grant's monthly payment was insufficient to cover those expenses.  The in-person meeting was held on

---

since abandoned his position that she was in default at that time.  *See Plaintiff's Pretrial Brief,* ECF No. 42, at 2 ("Ms. Grant may have been late on one early payment, but the breach was cured and is not germane to the issues between the parties.")

[40] Pl. Ex. 15 and 16.  Over the years, Huggins frequently paid the taxes on the Property late, incurring penalties totaling at least $1,627.23 between 1998 and 2022. Def. Ex. DD.

[41] Pl. Ex. 23, 24. After executing the 2016 Amendment, Grant paid one more payment of $219.00 in July of 2016 before her payment increased to $860.00 in August of 2016.

June 28, 2016 at the Property and was attended by Grant; Huggins; his wife, Heidi Huggins; and Grant's granddaughter, Jessica Grant. Grant's daughter, Colleen Bolton, also participated via telephone.[42] According to Grant, she first learned she did not own the Property during that meeting, when Huggins told her she could buy her house back for $30,000.00. Grant testified that Huggins represented to her that she still owed $30,000.00 under the Option Agreement and would owe Huggins a balloon payment for taxes and insurance at the time she exercised her option to repurchase.

Huggins presented Grant with an "Addendum/Amendment to Other: Lease Option" (the "2016 Amendment")—a one-page document which purported to modify the terms of the Option Agreement by requiring Grant to make increased payments of $860.00 per month for the remaining 138 months of the term, for a total amount due of $118,680.00 in addition to the $48,618.00 she had already paid.[43] The 2016 Amendment provided, in pertinent part:

> The undersigned Parties hereby agree as follows: This addendum modifies the original agreement dated January 13, 1998. Beginning August 15, 2016 both parties agree to change the option payment amount to $860.00 per month from this date forward until the expiration of the lease option.
>
> Future payments will include taxes, insurance, loan payments and maintenance and/or other expenses associated with the property. Both parties agree to revisit and adjust payments yearly or as needed in the event that property expenses change.
>
> If Ms. Louise Grant is unable to make future payments her son [Anthony Grant and Vanessa Grant][44] may continue to make them on her behalf.

---

[42] Heidi Huggins testified she was present at the June 2016 meeting and that the 2016 Amendment was signed on the same day as the meeting. Grant's granddaughter, Jessica Grant, testified she remembered Grant being presented with a different document than the 2016 Amendment, which indicated that she could elect to either (1) pay $860.00 per month over three years or (2) pay a lump sum of $30,000 to repurchase the Property. No such document was produced into evidence, and her testimony regarding a different document being presented was not corroborated by any other witnesses. According to Jessica, after Huggins left, she looked up on her computer the Property's public tax records and discovered that her grandmother no longer owned the Property. She then told her grandmother not to sign anything and suggested that Grant talk to an attorney, but Grant signed the 2016 Amendment the following day without any legal advice.

[43] Pl. Ex. 23 and 24.

[44] The names Anthony Grant and Vanessa Grant were handwritten on the document and initialed by the parties.

14

Neither Huggins nor Grant was represented by an attorney in connection with the preparation or execution of the 2016 Amendment.  Huggins testified that he explained to Grant that instead of being obligated to pay the taxes, insurance, and other expenses associated with the Property accrued during the term of their agreement in a lump sum upon exercising the option to repurchase, she would now be paying those expenses going forward as part of her increased monthly payment.  Both parties agreed that the increased payments under the 2016 Amendment were to be applied towards the increased costs for tax and insurance payments.

The agreement was unclear as to other aspects of the 2016 Amendment.  Grant's understanding was that, under the 2016 Amendment, if something happened to her, her son, Anthony Grant, and daughter, Vanessa Grant, could make the payments on her behalf.  However, the 2016 Amendment contains no language expressly giving optionee rights to Anthony Grant and Vanessa Grant.  In addition, while Huggins testified that Grant could have continued performing under the original Option Agreement, Grant indicated she did not believe she had a choice to do so, and that Huggins told her she had to sign the 2016 Amendment by 5:00 PM the next day if she wanted to buy her house back from him.  Grant stated she received no benefit under the 2016 Amendment and that she believed that by signing the 2016 Amendments, she had simply agreed to pay off the remaining obligation before the end of the term of the Option Agreement.

<u>POST AMENDMENT PAYMENTS</u>

Grant made payments of $860.00 per month from August of 2016 through June of 2019, totaling $30,100.00.[45]  In 2017 and 2018, Huggins was late in paying the taxes on the Property, so

---

[45] Pl. Ex. 23.

Grant paid the taxes in the amounts of $2,089.70 for 2017 and $2,133.60 for 2018.[46]  Huggins also

paid the taxes in 2018 but he received a refund check because Grant had already paid the taxes.

Combined with the $48,618.00 she paid Huggins before the 2016 Amendment, Grant believed she

had fulfilled her obligations under the original Option Agreement (*i.e.*, $219 x 360 months =

$78,840.00) because she had paid Huggins a total of $78,718.00, plus the taxes she paid in the

aggregate amount of $4,223.30—for a total of $82,941.30.  She testified that she then asked

Huggins for the deed, and he told her he would deliver it to her, but he never did.  Grant has made

no payments to Huggins since June of 2019.

Huggins paid property taxes on the Property for 2019 in the amount of $1,780.42, for 2020

in the amount of $2,290.20 (including a $290 late charge), for 2021 in the amount of $1,953.06,

and for 2022 in the amount of $1,976.52.[47]  The total amount of property taxes paid by Huggins

since 2019 is $7,649.31 (excluding late charges).[48]  Since 2019, Huggins has also paid for hazard

insurance for the Property in the total amount of $7,066.00, and flood insurance in the amount of

$2,868.00.

<u>CHARLESTON PRO BONO LEGAL SERVICES</u>

After Huggins failed to produce the deed, Grant sought advice from Charleston Pro Bono

Legal Services ("Charleston Pro Bono") in September of 2019.  She retained Nicole Paluzzi from

Charleston Pro Bono, who wrote a letter, dated September 25, 2019, on Grant's behalf demanding

the deed to the Property.[49]  Huggins responded by sending a demand letter to Grant on October 9,

2019, advising her that she had failed to make payments for the months of July, August, September,

---

[46] Def. Exs. R, S, and DD.  Huggins testified that he was not aware that Grant had paid those taxes until later, because he assumed that the mortgage company had paid those expenses.
[47] Pl. Ex. 16 and 25; Def. Ex. DD.
[48] Pl. Ex. 24 and 25.
[49] Def. Ex. V.

and October of 2019 and that "per our agreement any missed payment terminates your option to

purchase agreement" and therefore "your option to purchase agreement is void and terminated."[50]

The letter further stated:

> If you wish to remain in the home as a tenant and pay the current market rent of $2,000, the enclosed lease agreement and other documents that are attached need to be signed and returned within 5 calendar days from the date of this letter along with certified funds for the first month's rent and security deposit totaling $2,500.

> Failure to vacate or return the executed agreement and first month's rent and security deposit will result in eviction from the premises.

At the direction of Ms. Paluzzi, Grant filed a complaint with the South Carolina Fair

Housing Authority.  Ms. Paluzzi testified that the complaint was dismissed by the South Carolina

Human Affairs Commission in June of 2020 for insufficient evidence to meet the statutory

elements for violation of S.C. Code Ann. § 31-21-40(1) or (2) of the South Carolina Fair Housing

Law.[51]

During her representation of Grant, Ms. Paluzzi testified that she met with J. Howard Yates,

Jr., a lawyer and former professor of law whose practice is focused on real property law, to assist

her in determining the legal effect of the 1998 Contract, Option Agreement and 2016 Amendment.

They reviewed the documents together and ultimately concluded that the transaction between

Huggins and Grant appeared to be an equitable mortgage.[52]

---

[50] Def. Ex. W.

[51] Def. Ex. Y; Pl. Ex. 26.  Specifically, the Commission found insufficient evidence that Huggins had "expressed a willingness to negotiate with someone not of complainant's [Grant's] protected class," "taken similar action against a tenant of a different protected class," or "impose[d] [unfavorable or less favorable terms] to residents not of complainant's protected class."  The South Carolina Human Affairs Commission further found that there was no reasonable cause to believe that [Huggins] had subjected [Grant] to discriminatory financing or redlining based on race, sex, and familial status in violation of S.C. Code Ann. § 31-21-60.

[52] Mr. Yates was not designated as an expert witness by Grant; therefore, the Court is not crediting his conclusions as expert testimony.

## STATE COURT ACTION

Huggins filed an Application for Ejectment against Grant in Magistrate's Court in Charleston County on August 20, 2020.[53] Ms. Paluzzi represented Grant before the Magistrate's Court and asserted a counterclaim for equitable mortgage on Grant's behalf.  By order filed on August 20, 2020, the Magistrate found that Grant had raised a counterclaim seeking damages in excess of the civil jurisdiction of the Magistrate Court and that Grant had asserted a color of title claim to the Property; therefore, the case was transferred to the Court of Common Pleas in Charleston County, Case Number 2020-CP-10-03614 ("State Court Action").[54]  At that point, Ms. Paluzzi sought private bar representation of Grant in the State Court Action.

On October 5, 2020, Huggins filed an Amended Summons and Complaint in the State Court Action, alleging claims against Grant for Action for Possession, Foreclosure, and Breach of Contract.[55]  On April 30, 2021, Grant filed her Answer and Counterclaim, alleging counterclaims for Fraud, Unfair Trade Practices Act violation, Breach of Contract, Declaration of Equitable Mortgage, and Unjust Enrichment.[56]

On April 22, 2022, Huggins filed a motion for partial summary judgment in the State Court Action, seeking summary judgment as to Count I (Eviction) and Count II (Breach of Contract) on grounds that Grant was collaterally and judicially estopped from asserting that she owns the Property or that she had a mortgage relationship with Huggins in connection with the Property based on her inconsistent sworn statements she made in her 2013 bankruptcy case.[57]  By judgment

---

[53] Def. Ex. AA.
[54] Def. Ex. BB.
[55] ECF No. 1, Ex. B (Amended Summons and Complaint).
[56] *Id.*, Ex. C (Answer to First Amended Complaint and Counterclaim).
[57] *Id.*, Ex. E (Motion for Summary Judgment Plaintiff)

filed June 6, 2022, the Magistrate Judge denied Huggins' motion for partial summary judgment without making formal findings of fact and conclusions of law.[58]

<p style="text-align:center;">HUGGINS' BANKRUPTCY CASE</p>

On January 19, 2023 ("the Petition Date")–the eve of trial in the State Court Action—Huggins filed for Chapter 13 bankruptcy relief.[59]  In his Schedules, Huggins listed ownership of the Property on Schedule A as well as another property, which appears to be his residence.  He further listed a lease to Grant on Schedule G – Executory Contracts and Unexpired Leases.  The Property is listed in the Schedules as having a current value of $384,300.00.[60]  Huggins listed Wells Fargo Home Equity as a secured creditor, with a claim in the amount of $48,795.00, which is secured by the Property.[61]  Huggins testified that the Property was now worth approximately $442,000.00 according to an estimate provided on www.zillow.com.  On February 1, 2023, Huggins filed a chapter 13 plan, which provided:

> The Debtor's bankruptcy plan is predicated on the successful outcome of litigation related to the determination of the Debtor's rights and interests in [the Property].  The Debtor asserts that he is the owner of the property and is attempting to evict a tenant from the property.  The tenant disputes this claim and has filed counterclaims asserting that she has an ownership interest in the property.  Debtor believes that he will be successfully adjudicated to be the rightful owner of the property at 89 America Street, and upon the adjudication of his ownership in the property, he will market and sell that property and use the proceeds to fully pay his creditors.  This plan contemplates completing this litigation and selling the house within a 8-month period.  In the event this process takes longer than eight (8) months, Debtor has provided for up to 24 months of regular plan payments to allow for variance in the litigation schedule and sale process for this property right adjudication.  In any event, if the property rights are adjudicated sooner than expected and the Debtor is able to sell the property, he will pay his creditors as soon as possible after the sale.  The debtor contemplates that this matter may also be resolved by settlement and will notice that settlement to his creditors via a notice of settlement in this bankruptcy.

---

[58] Def. Ex. CC.
[59] Case No. 23-00184-eg, ECF No. 1.
[60] Wells Fargo Bank, N.A. filed a proof of claim in Huggins' bankruptcy case, claiming a debt in the amount of $50,394.56, secured by the Property. C/A No. 23-00184, Claim No. 5-1, filed Mar. 13, 2023.
[61] Schedule D, Case No. 23-00184, ECF No. 1.

Grant filed a proof of claim in Huggins' case on March 15, 2023, asserting a debt in the amount of $234,000.00 secured by an equitable mortgage on the Property arising from the Option Agreement.[62]  The plan was amended on April 24, 2023 and June 14, 2023.[63]  Section 8.2 of the Second Amended Plan provides that "Louise Grant has filed a secured claim in the Debtor's case asserting claims which are to be determined from the ongoing adversary proceeding before this court [in Adv. Pro.] No. 23-80013-eg.  If the Court determines that Louise Grant is entitled to any claim from the adversary proceeding, she will be entitled to payment to be paid directly by the Debtor."  The Amended Plan further provides that:

> [T]the adversary proceeding, [Adv. Pro.] No. 23-80013-eg contains disputes over the effect of an agreement between the Debtor and Louise Grant.  The parties to that litigation dispute the character of the contracts which may or may not be an executory contract.  Nothing in the confirmation of this plan will affect the rights of the parties through the termination of an executory contract and any decision on the character of those contracts will be determined by future order of this Court."  The Second Amended Plan was confirmed by order entered July 18, 2023.[64]

Huggins objected to Grant's proof of Claim, and Grant filed a Response.[65]  The parties entered into a Consent Order to Resolve Claims Objection, which provided that the Objection to Claim and Response were removed from the docket and would be resolved through the Adversary Proceeding.[66]

## ADVERSARY PROCEEDING

On February 22, 2023, Huggins filed a Notice of Removal of State Court Action pursuant to Federal Rule of Bankruptcy Procedure 9027 and 28 U.S.C. § 1452 in this Court, commencing

---

[62] Case No. 23-00184-eg, Proof of Claim No. 6-1.  Grant attached copies of the Answer and Counterclaims she filed in the State Court Action in support of her claim.
[63] Case No. 23-00184-eg, ECF No. 33 (filed Apr. 24, 2023); ECF No. 53 (filed Jun. 14, 2023).
[64] Case No. 23-00184-eg, ECF No. 69.
[65] Case No. 23-00184-eg, ECF Nos. 36 and 43.
[66] Case No. 23-00184-eg, ECF Nos. 63, 73, 95, and 98.

this Adversary Proceeding.[67]  Huggins filed the Amended Complaint on April 14, 2023, asserting

four causes of actions set forth above.  The Court entered a Consent Scheduling Order on April 4,

2023, wherein the parties consented to the removal of the State Court Action to this Court under

28 U.S.C. § 1452 and consented to the entry of final orders or judgments by this Court.  Grant filed

an Answer and Counterclaims to the Amended Complaint, asserting the Affirmative Defenses and

including the five Counterclaims.  Huggins filed responses to the Counterclaims and asserted

various affirmative defenses, including that the counterclaims were barred by the statute of

limitations; that any liability had to be reduced or eliminated by the doctrine of setoff, recoupment,

and contribution; estoppel; laches, waiver and unclean hands; and the doctrine of acquiescence

and ratification.

The Court conducted a two-day trial on October 25-26, 2023, during which the parties

presented the testimony of Huggins; Huggins' wife, Heidi Huggins; Grant; Grant's daughter,

Vanessa Grant; Grant's granddaughter, Jessica Grant; Grant's prior attorney, Nicole Paluzzi, and

attorney J. Howard Yates, Jr.  At the conclusion of the trial, the Court requested proposed findings

of fact and conclusions of law from both parties, both of which were filed on December 1, 2023.[68]

## CONCLUSIONS OF LAW

I.   **Huggins' Claims: Action for Possession, Foreclosure, Breach of Contract & Estoppel**

In the Amended Complaint, Huggins asks this Court to find that he is the true owner of the

Property, that Grant has no right or interest in the Property, and that Huggins should be allowed to

proceed with state court remedies to evict and remove Grant from the Property.  As a basis for the

relief requested, Huggins asserts the following claims: (1) an action for possession pursuant to S.C.

---

[67] ECF No. 1.
[68] ECF Nos. 52 and 53.

Code Ann. § 27-40-10, *et seq*. (the South Carolina Residential Landlord and Tenant Act); (2) if

the agreement is determined to be a mortgage of some sort, an action for foreclosure of the lien for

the value of the unpaid portion of the option, currently $233,742.15; (3) an action for breach of

contract based upon Grant's failure to make payments since July 2019 and her failure to pay

Huggins his costs and expenses; and (4) estoppel based upon Grant's failure to disclose any interest

in the Property during her 2013 bankruptcy case.

The determination of the viability of these claims and the legal effect of the documents

executed by the parties are a conundrum—the complexity and ambiguity of which is exacerbated

by the fact the documents representing the contractual relationship between the parties were

prepared by non-lawyers without the assistance of counsel and many of the discussions between

the parties relating to their agreement occurred more than 25 years ago.  There are several issues

which must first be resolved in order to determine whether Huggins is entitled to the relief he

requests, including (1) whether the Grant's claims are barred by judicial estoppel, laches, or any

applicable statutes of limitations; (2) whether the documents governing the transaction between

Grant and Huggins should be deemed an equitable mortgage; (3) alternatively, whether the Option

Agreement was an installment land contract; (4) whether Grant's 2013 bankruptcy had any effect

on the enforceability of the documents governing the transaction; and (5) whether the 2016

Amendment is enforceable.  Ultimately, for the reasons set forth in detail below, the Court

concludes that (a) judicial estoppel does not bar Grant's claims in this proceeding; (b) the

transaction appears to be in the nature of an equitable mortgage which has been repaid, thus

entitling Grant to conveyance of title to the Property back to her; (c) Grant's claim for equitable

mortgage is not barred by laches or statute of limitations; (d) the Option Agreement is not an

installment land contract, but even if it was, Grant would still be entitled to the return of the

Property, as she has fully performed her obligations under that Agreement; (e) Grant's bankruptcy

filing had no effect on the transaction; and (f) the 2016 Amendment is unenforceable for lack of

consideration.  Accordingly, Huggins' claims for possession pursuant to S.C. Code Ann. § 27-40-

10, et al. (the South Carolina Residential Landlord and Tenant Act); foreclosure; breach of contract

and estoppel are denied.

## II.    Grant's Claims Are Not Barred by Judicial Estoppel

At the outset, Huggins asserts that Grant should be judicially estopped from claiming any

interest in the Property based upon her failure to disclose her interest in the Property during her

2013 bankruptcy case.[69]  The Court disagrees.

On April 15, 2013, Grant commenced her Chapter 13 bankruptcy case. While Grant's

Schedules indicated that she lived at the Property and paid "rent or home mortgage payment" of

$219.00 per month, Grant did not list ownership of the Property on Schedule A, did not list

Huggins as a creditor or party in interest on Schedules D, E, or F or on the notice list attached to

the Schedules, did not list any executory contracts on Schedule G, did not include treatment of

Huggins' claim in her chapter 13 plan, and did not claim ownership of the Property during her §

341 Meeting of Creditors.

Based on those nondisclosures, Huggins argues Grant is barred from asserting ownership

of the Property in this proceeding because she would be taking a position that is contrary to her

position in her prior bankruptcy.  He further asserts that Grant's failure to disclose her interest in

---

[69] In the motion for summary judgment filed in the State Court Action, Huggins also raised collateral estoppel as a bar to Grant's claim of an interest in the Property.  At trial, Huggins' arguments and briefs appeared to focus solely on judicial estoppel.  The Court finds that Huggins has abandoned the collateral estoppel arguments by not presenting argument on this issue.  Regardless, collateral estoppel does not apply because the issue of ownership of the Property was not actually litigated or determined in Grant's bankruptcy case.  *See Am. Cyanamid Co. v. St. Louis Univ.,* 5 F. App'x 131, 133 (4th Cir. 2001) (citing *Sedlack v. Braswell Servs. Grp., Inc.,* 134 F.3d 219, 224 (4th Cir.1998)) (describing collateral estoppel as applying if the proponent establishes, among other factors, that the issue sought to be precluded is identical to one previously litigated; and was *actually determined* in the prior proceeding.)

the Property was relied upon by the bankruptcy court in granting her discharge and gave Grant an

unfair advantage in her bankruptcy case.  Huggins contends that the Court should determine that

Grant has no interest whatsoever in the Property on the basis of judicial estoppel.

"[J]udicial estoppel is an equitable doctrine, designed to 'protect the integrity of the judicial

process by prohibiting parties from deliberately changing positions according to the exigencies of

the moment.'"  *Martineau v. Wier,* 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire v.*

*Maine,* 532 U.S. 742, 749-50 (2001)).  "The law of the regional circuit governs the analysis of

judicial estoppel."[70]  *Samsung Electronics Co., Ltd v. NVIDIA Corp.,* 160 F.Supp.3d 866, 871

(E.D.Va. 2015) (citing *Minnesota Min. & Mfg. Co. v. Chemque, Inc.,* 303 F.3d 1294, 1302-03

(Fed. Cir. 2002)).  As set forth by the Fourth Circuit, judicial estoppel is applicable under the

following circumstances:

> First, the party sought to be estopped must be seeking to adopt a position that is
> inconsistent with a stance taken in prior litigation. And the position sought to be
> estopped must be one of fact rather than law or legal theory. Second, the prior
> inconsistent position must have been accepted by the court. . . . *Finally, the party*
> *sought to be estopped must have intentionally misled the court to gain unfair*
> *advantage. Indeed, we have stated that this factor is the determinative factor in the*
> *application of judicial estoppel to a particular case.* Thus, courts will not apply
> judicial estoppel when a party's prior position was based on inadvertence or
> mistake.

*Lowery v. Stovall*, 92 F.3d 219, 224 (4thCir. 1996) (internal citations and quotation marks omitted)

(emphasis added); *see also Windham v. Med. Univ. of S.C.*, No. 2:19-01306, 2021 WL 7279050

(D. S.C. Aug. 18, 2021) (applying the standards in *Lowery* in concluding that judicial estoppel did

---

[70] Grant appears to rely on South Carolina state law for the applicable standard for judicial estoppel.  Under state law, the elements of judicial estoppel are (1) two inconsistent positions taken by the same party; (2) the positions must be taken in the same or related proceedings involving the same party; (3) the party must have been successful in maintaining that position and received some benefit; (4) the inconsistency must be part of an intentional effort to mislead the court; and (5) the two positions must be totally inconsistent. *Cothran v. Brown,* 592 S.E.2d 629, 631 (S.C. 2004).  While the Court finds that the federal standard is applicable, the Court's ruling would remain the same under either standard.

not apply to the issues before the court).   The party seeking to invoke the doctrine of judicial

estoppel bears the burden to demonstrate that these elements are met.  *Samsung Electronics Co.,*

*Ltd v. NVIDIA Corp.,* 160 F.Supp.3d at 875.  Notably, the Fourth Circuit has further observed that

"[w]hether the equitable doctrine of judicial estoppel should be invoked depends on the specific

factual context of a case, rather than any general formulation or inflexible rule or standard."

*Martineau v. Wier,* 934 F.3d at 394 (internal quotations omitted) (citing *New Hampshire,* 532 U.S.

at 750-51).  The application of the judicial estoppel doctrine is ultimately in the discretion of the

Court. *Id.* ("[A]s an equitable doctrine, judicial estoppel is invoked in the discretion of the district

court and with the recognition that each application must be decided upon its own specific facts

and circumstances.") (quoting *King v. Herbert J. Thomas Memorial Hosp.,* 159 F.3d 192, 197 (4th

Cir. 1998)).   "Because of the harsh results attendant with precluding a party from asserting a

position that would normally be available to the party, judicial estoppel must be applied with

caution." *Lowery v. Stovall*, 92 F.3d at 224.

The Court does not need to analyze whether the first two factors are met because, based on

the evidence presented, the final and determinative factor for invoking judicial estoppel—whether

the party sought to be estopped intentionally misled the Court to gain unfair advantage—has not

been satisfied; therefore, judicial estoppel does not apply to bar Grant's Counterclaims or interest

in the Property.  Grant asserts that the omission of the Property from her Schedules was not to

intentionally mislead the Court; rather, it was inadvertent and resulted from her confusion

regarding the nature of her interest.  While the Court in no way condones the filing of inaccurate

or untruthful schedules or statements by any debtor, it finds that Grant's failure to disclose any

interest in the Property in her bankruptcy case was mitigated by the ambiguous nature of the

transaction and documents at issue in this case.[71]    The ambiguity was created as a result of

documents drafted or prepared by Huggins without the assistance of counsel.   Even Huggins

expressed confusion about the nature of the transaction between the parties, initially asserting that

he believed the parties' agreement was a lease agreement but later claiming that it is in fact an

installment sales contract.   Under the circumstances, it would be inequitable for the Court to allow

Huggins to prevail on judicial estoppel grounds based upon Grant's mistaken representation in her

bankruptcy schedules that she did not own the Property—a mistake which appears to have been

caused by the confusing and ambiguous documents prepared by the party asserting that judicial

estoppel should be applied.

Huggins asserts that Grant received an advantage from her nondisclosure of any interest in

the Property because her property interest was not placed at risk in her bankruptcy.   However, he

did not present evidence demonstrating any specific advantage Grant may have received in her

bankruptcy case by failing to disclose an interest in the Property.   No evidence was presented

showing that Grant's nondisclosure played any role in the confirmation of her Chapter 13 plan or

that disclosure of her interest in the Property—whatever it may have been—would have led to a

different recovery by general unsecured creditors in her bankruptcy case.   Significantly, there is

---

[71] The Court further acknowledges that the filing of inaccurate schedules and statements can have severe consequences and debtors cannot simply bury their heads in the sand when they do not understand what information is required to be disclosed.  This case presents a unique set of circumstances, and the Court reaches the conclusions set forth herein after a careful and thorough review of all the evidence before it.  While reliance on counsel's advice is not a bullet-proof defense for a debtor filing incomplete or incorrect schedules and statements with the Court, it bears notice that Grant was represented by counsel during her bankruptcy case.  Moreover, there is no indication that she was trying to hide the fact that she lived in the Property, as its address was listed as her residence on the voluntary petition.  *See In re Kinsale,* 617 B.R. 58, 67 (Bankr. D.S.C. 2020) ("Since bankruptcy schedules and statements are carefully designed to elicit certain information necessary for the proper administration of cases, Debtors have a duty to complete these documents thoughtfully and thoroughly.  Furthermore, accuracy, honesty, and full disclosure are critical to the functioning of bankruptcy and are inherent in the bargain for a debtor's discharge.  Therefore, debtors are responsible for disclosing an accurate and complete schedule of assets with proper values and a truthful statement of affairs in order to convey a complete and accurate portrayal of their financial situation.") (quoting *In re Simpson,* 306 B.R. 793, 797-98 (Bankr. D.S.C. 2003)).

no evidence regarding the value of her interest in the Property at the time of her bankruptcy case or her entitlement to any exemption for the Property.

The evidence does not indicate Grant had any motive to conceal her interest in the Property. She testified that she believed she did not own the Property at the time she filed bankruptcy because she had not finished making the payments yet and that the payments to Huggins did not have anything to do with her bankruptcy case. At another point in her testimony, Grant inconsistently stated that she believed she owned the Property until 2016 when Huggins approached her regarding the 2016 Amendment. As a whole, Grant's testimony demonstrated that she was unsophisticated regarding real estate matters, was confused regarding the nature of the transaction, and did not understand the legal effect of the documents she signed, which the Court is left to decipher.

Grant was not in default under the Option Agreement at the time she filed bankruptcy, she disclosed a monthly rental/home mortgage payment obligation of $219.00 per month in her Schedules, she listed the Property's address as her place of residence, and she continued to make timely monthly payments to Huggins throughout her bankruptcy case. When she completed the payments required under the Option Agreement, Grant sought to exercise her option to repurchase or alternatively to exercise her right of redemption. Said differently, Grant neither understood the nature of her interest in the Property nor that this interest was required to be disclosed on her schedule of assets. Based on the record before it, the Court does not believe Grant had a sufficiently culpable mental state regarding her nondisclosure to warrant the application of judicial estoppel.

In support of his argument that judicial estoppel should be applied to bar Grant from claiming an interest in the Property, Huggins relies on *In re Coastal Plains, Inc*., where the Fifth Circuit applied a presumption that a debtor who fails to disclose a legal claim in bankruptcy

proceedings is presumed to have acted in bad faith unless she either lacks knowledge of the undisclosed claims or has no motive for their concealment. *See In re Coastal Plains, Inc.,* 179 F.3d 197, 210 (5th Cir. 1999) (finding that "the debtor's failure to satisfy its statutory disclosure duty is inadvertent only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment"); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355 (3rd Cir. 1996) (finding that the combination of knowledge of the claim and motive for concealment in the face of an affirmative duty to disclose gives rise to an inference of intent sufficient to satisfy the bad faith requirement.)  The practical application of this presumption means that so long as a debtor has knowledge of the facts that someday will underlie a future claim or interest, it may be inferred that such debtor failed to disclose that claim in a deliberate and bad-faith effort to mislead the courts.

The Fourth Circuit has rejected the approach taken by the Fifth Circuit in *Coastal Plains*, instead finding that the court must consider all of the specific facts and circumstances of each case that might bear on whether the nondisclosure was intended to deceive or was a good faith error before holding that a claim is barred by judicial estoppel. *Martineau v. Wier,* 934 F.3d 385, 394 (4th Cir. 2019).  The Fourth Circuit further observed that "'limiting judicial estoppel to those cases in which the facts and circumstances warrant it' helps to 'reduce the risk that [its] application'" will give any one party a windfall. *Id.* (quoting *Slater v. United States Steel Corp.,* 871 F.3d 1174 (11th Cir. 2017)).  Other courts have similarly refused to apply a bad faith presumption due to a party's mere nondisclosure of a claim in a bankruptcy case when determining whether judicial estoppel should apply. *See, e.g., Slater,* 871 F.3d at 1189; *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 548 (7th Cir. 2014); *Ah Quin v. County of Kauai Dept. of Transp.,* 733 F.3d 267, 277 (9th Cir. 2013); *Eubanks v. CBSK Fin. Grp., Inc.,* 385 F.3d 894, 899 (6th Cir. 2004).

Huggins argues that the *Martineau* case and other similar cases are distinguishable because they mostly involved chapter 7 cases where the debtor failed to disclose exemptible tort matters and because Grant did not attempt to correct her nondisclosure at any time.  The Court disagrees that this case is distinguishable on those grounds.  The fundamental principles of judicial estoppel remain the same whether the prior litigation was a chapter 7 or chapter 13 bankruptcy case or any other type of case—it is ultimately a question of whether the integrity of the court would be impaired by the party's change in position. *See Slater,* 871 F.3d at 1184 (rejecting prior precedent applying an inference in both chapter 7 and chapter 13 cases that a plaintiff intended to make a mockery of the judicial system simply because he failed to disclose a claim, instead requiring the court to consider all the facts and circumstances of the case, including the plaintiff's level of sophistication, his explanation for the omission, whether he subsequently corrected the disclosures, and any action taken by the bankruptcy court concerning the nondisclosure).  This Court sees no such impairment in this case.

As stated by the Fourth Circuit, "judicial estoppel is an equitable doctrine, designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Martineau,* 934 F.3d at 393.  Whether or not a debtor attempted to remedy an omission by amending her bankruptcy filings is just one fact that may be considered in determining whether to apply judicial estoppel.  *See Martineau,* 934 F.3d at 398 (finding that a debtor's delay in seeking to reopen her bankruptcy proceeding to disclose an omitted cause of action may be considered, together with all other relevant facts and circumstances, to determine whether it is evidence of a deliberate effort to hide claims from the bankruptcy court); *see also Slater,* 871 F.3d at 1186 (observing that the Bankruptcy Code and Rules liberally permit debtors to amend their disclosures when an omission is discovered and that

the court retains broad discretion to reopen a closed case on motion of the debtor or another party in interest "to administer" an asset that had not previously been scheduled).

Under the facts of this case and after a careful review of the record before it, the Court cannot find that Grant changed her position to gain an advantage or make a mockery of judicial proceedings.  Grant was confused or mistaken regarding her rights in the Property due to her limited education and lack of sophistication when it came to business, legal, or financial dealings. *Slater,* 871 F.3d at 1185 (finding that when the plaintiff's inconsistent statement comes in the form of an omission in bankruptcy disclosures, the court may consider the plaintiff's level of sophistication as one of the factors to determine whether the inconsistent statements were calculated to make a mockery of the judicial system).  Given the ambiguity and vagueness of the documents and the legal interest they left to Grant or transferred to Huggins—issues that the Court is sifting through and over which the parties have been litigating for the past five years—Grant's muddled understanding regarding her rights in the Property until the State Court Action commenced is not surprising.  "Judicial estoppel should not be applied when the inconsistent positions were the result of inadvertence or mistake because judicial estoppel looks towards cold manipulation and not an unthinking or confused blunder." *Slater,* 871 F.3d at 1181 (internal quotations omitted) (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.,* 485 F.2d 164, 175 (5thCir. 1973)).

Moreover, "[a]s an equitable doctrine, judicial estoppel is invoked in the discretion of the district court and with the recognition that each application must be decided upon its own specific facts and circumstances." *King v. Herbert J. Thomas Memorial Hosp.,* 159 F.3d 192, 196 (4th Cir.

1998).[72]  The application of judicial estoppel would impede the truth-seeking function of this court and prevent a fair and equitable resolution of the matter before the Court on the merits.  *See Kiawah Island Utility, Inc. v. Westport Ins. Corp.,* No. 2:19-cv-1359, 2019 WL 5395966, at *6 (D.S.C. Oct. 22, 2019) (*quoting Teledyne Indus., Inc. v. N.L.R.B.,* 911 F.2d 1214, 1218 (6th Cir. 1990) ("Judicial estoppel is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement.")).  Accordingly, the Court will not apply judicial estoppel to bar Grant's claims in this adversary proceeding or to bar her from asserting an interest in the Property.[73]

### III.   The Documents Expressing the Agreement Between Grant and Huggins Give Rise to an Equitable Mortgage

The parties dispute the nature of the documents evidencing the transaction and what legal interest the instruments conveyed to Huggins under South Carolina law.[74]  Huggins claims it is a land installment contract, while Grant claims it is an equitable mortgage granting Huggins a debt and security interest in the Property.  "The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties and, in determining that intention, the court looks to the language of the contract." *Buonaiuto v. Town of Hilton Head Island,* 889 S.E.2d 625, 630 (S.C. Ct. App. 2023) (quoting *First South Bank v. Rosenberg,* 790 S.E.2d 919, 925 (S.C. Ct. App. 2016)).  The contract must be construed as a whole so as to provide meaning to all provisions of the

---

[72] State law also provides that the application of judicial estoppel is discretionary.  *See, e.g., Cothran v. Brown,* 592 S.E.2d 629, 632 (S.C. 2004) ("The doctrine of judicial estoppel is an equitable concept and should be applied sparingly, with clear regard for the facts of the particular case.").

[73] In light of the Court's conclusion that the requirements for application of judicial estoppel are not met, it is unnecessary to determine, as argued by Grant, whether Huggins is collaterally estopped from raising judicial estoppel because the judicial estoppel issue was raised in the motion for summary judgment in state court and denied by the Master-In-Equity.

[74] "A contract is controlled by the laws of the State in which it is made and is to be performed." *Doctors Hosp. of Augusta, L.L.C. v. CompTrust AGC Workers' Comp. Fund,* 636 S.E.2d 862, 864 (S.C. 2006).  Since the Option Agreement was drafted and performed in South Carolina and involves real property located in the state, South Carolina law applies.

contract. *In re Brown,* C/A No. 16-06221-JW, slip op. at 7 (Bankr. D.S.C. May 11, 2017) (citing *McGill v. Moore,* 672 S.E.2d 571, 574 (S.C. 2009)). "Any remaining doubts or ambiguities in a contract should be construed against the drafter of the contract." *Id.* at 8 (citing *Mathis v. Brown & Brown of S. Carolina, Inc.,* 698 S.E.2d 773, 778 (S.C. 2010)).

### a. Equitable Mortgage Analysis Under South Carolina Law

Grant asserts that the 1998 Contract and Option Agreement, when viewed together, create an equitable mortgage. Huggins initially took the position that these documents created a lease with an option to purchase the Property, but later he seems to have abandoned that argument and now asserts that the Option Agreement is an installment sales contract. From the outset, the Court finds that these documents do not constitute a lease with an option to purchase, and neither party intended to enter into a lease with option to purchase.[75] Thus, the issue for the Court to resolve is whether the documents created an equitable mortgage in Huggins' favor, as lender-grantee, or an installment sale contract that Grant could exercise upon the completion of her obligations.

Huggins testified that Grant had to make the monthly payments for the term of the Option Agreement and, to exercise her option, she would also have to reimburse him for any costs he paid that were related to the Property—including taxes, insurance, maintenance, and legal costs. Huggins relies upon language in the Option Agreement referring to "other expenses incidental to the purchase of aforesaid real estate" in support of his argument that Grant would be responsible for the repayment of these expenses if she exercised the option.[76]

Under South Carolina law, "an equitable mortgage is a transaction that has the intent but not the form of a mortgage which the court will enforce in equity to the same extent as a mortgage."

---

[75] Notably, the Option Agreement lacks the proper terminology and requisite provisions to be classified as a residential lease agreement. The Option Agreement never classified the Property as rental property, nor did it classify Grant as a tenant and Huggins as the landlord.

[76] Pl. Ex. 1.

*Walker v. Brooks,* 778 S.E.2d 477, 479 (S.C. 2015).  Typically, a transaction giving rise to an

equitable mortgage involves an absolute deed transferred from the borrower-grantor to the lender-

grantee, which is accompanied by an agreement, oral or in writing, by the lender-grantee to

reconvey the property upon payment of a debt according to its terms. *See* RESTATEMENT (THIRD)

OF PROP.: MORTGAGES § 3.2 (Am. L. Inst. 1997).  Where "the evidence surrounding the transaction

indicates the land transfer was intended only to secure a debt, a court may refuse to treat the

conveyance as a sale and instead equitably impose on the parties the mortgage they intended to

create." *Walker v. Brooks,* 778 S.E.2d at 479 (citing 59 C.J.S. *Mortgages* § 36).  The burden of

proof for establishing an equitable mortgage has been previously articulated as follows:

(1) An instrument of writing is what upon its face it purports to be.
(2) The complaint must contain the necessary allegation that the deed, though absolute on its face, was intended as a mortgage.
(3) This allegation must be sustained by testimony *prima facie* showing that it is true. When this is done, it removes the presumption arising from the fact that a paper is presumed to be what its face imports.
(4) When this is done, it is incumbent on the mortgagee to remove the inferences that may be drawn from such *prima facie* showing.  This is sometimes spoken of as the burden of proof, but it is simply making it incumbent on the mortgagee to disprove the case as then made.

*F. Gregorie & Son v. Hamlin,* 257 S.E.2d 699, 707-08 (S.C. 1979) (quoting *Shiver v. Arthur,* 32

S.E. 310, 312 (S.C. 1899)).  In simpler terms, a deed is presumed to be such, and the burden of

proof shifts from the party alleging it to be an equitable mortgage—Grant—to the

mortgagee/lender once a *prima facie* showing is made. "The existence of an equitable mortgage

must be shown by clear and convincing evidence." *Walker v. Brooks,* 778 S.E.2d at 479. "Clear

and convincing evidence is that degree of proof which will produce in the mind of the trier of facts

a firm belief as to the allegations sought to be established. . . . Such measure of proof is

intermediate, more than a mere preponderance but less [than] that required for proof beyond a

reasonable doubt; *it does not mean clear and unequivocal*." *In re Dickey,* 718 S.E.2d 739, 748 (S.C. 2011) (emphasis added).

The focus of the Court's inquiry is the intent of the parties, which is evaluated at the time of the conveyance. *Hamlin,* 257 S.E.2d at 701 ("[The court] must search for the intention of the parties at the time of the transaction and not as any of them may interpret their intentions at this time"). When determining the intent of the parties at the time of the transaction, South Carolina courts have examined the following factors: (1) the existence and survival of a debt after the transaction in question; (2) a deed being executed simultaneously with a contract to reconvey; (3) previous negotiations of the parties and course of dealing leading up to the deed in question; (4) inadequate consideration or price; (5) dealings between the parties; and (6) the terms of the contract for reconveyance. *Hamlin,* 257 S.E.2d at 702-8.[77] If the Court finds that an equitable mortgage was intended at the time of the conveyance, the subsequent dealings and transactions between the parties will not change the nature of the transaction.

Each of the factors to determine whether the Option Agreement and 1998 Contract constituted an equitable mortgage is analyzed in detail below.

---

[77] In *Hamlin,* a family owned a plantation and a company, and the company was in financial distress, with two creditors exerting continuing pressure on the company to repay their debts. *Id.* at 415-16. It was decided that the company would borrow money from a bank to repay the debts to the two creditors, and in return, the bank was given a note secured by a mortgage on the plantation. *Id.* at 416. A longtime friend of the family and lender to the company (the "Grantee") guaranteed the note, and in consideration thereof, the family gave him a deed purporting to convey the plantation to him. *Id.* Contemporaneously with the execution of the deed, the Grantee and the family entered into an agreement whereby the family could repurchase the property. *Id.* The Court concluded the deed constituted an equitable mortgage rather than an actual conveyance of the plantation based on the following factors: (1) the family owed a debt to the Grantee at the time of the deed's execution, which was extinguished thereby; (2) the amount to repurchase the property was approximately the same amount as the family debt to the Grantee; (3) the deed was executed simultaneously with the repurchase agreement; (4) there was no indication that the parties intended the transaction to be a sale; (5) the Grantee's consideration for the deed would be grossly inadequate to purchase the property considering its value, leading to the inference that the parties intended the conveyance merely as security for the Grantee's debt; (6) the long-term course of dealings between the parties indicated that it was a relationship of lender (Grantee) and borrower (the family), and this transaction began by the family seeking a loan and was not transformed at any point into a sale transaction; and (7) the Grantee's failure to record the deed until over two years after its execution indicated that he did not consider the deed to be an actual conveyance of the property until after the family defaulted in payment. *Id.* at 419-30.

1. *Existence and Survival of a Debt*

Huggins approached Grant because her home was in foreclosure due to her failure to make payments on a debt owed to Fleet Mortgage.  Huggins offered to "save her home from foreclosure" by paying the debt arrearage Grant owed to Fleet Mortgage in the approximate amount of $4,500.00 on her behalf.  In return, Grant agreed to convey the Property to Huggins and make payments of $219.00 for 360 months to him—creating a debt of $78,840.00[78]—which survived the conveyance of the Property.  Upon repayment of this debt under the terms of the Option Agreement, Huggins agreed to reconvey the Property to Grant.  The existence of the debt owed to Huggins for reinstating the loan and stopping the foreclosure, and the fact that the debt remained due and owing after the transaction, is strong indicia that this conveyance was intended as security for a debt.  *See Hamlin,* 257 S.E.2d at 702.

2. *Simultaneous Execution of Deed and Contract to Reconvey*

"A conveyance accompanied by a re-purchase agreement is a strong circumstance to be considered in the determination between a deed absolute and equitable mortgage."  *Id.* at 422 (citing *Stackhouse v. Conerly,* 96 S.E. 255, 255 (S.C. 1918)).  The 1998 Contract and Option Agreement were both executed on January 13, 1998.  Due to issues with the title caused by the death of Grant's husband, the quit claim deed from Grant to Huggins was not executed until February 16, 1998.  However, Grant's obligation to execute the deed was created by the 1998 Contract,[79] and this Contract was executed simultaneously with the Option Agreement, which

---

[78] While it is not entirely clear whether Grant is taking the position that upon the Court's finding that the 1998 Contract and Option Agreement together constitute an equitable mortgage in Huggins' favor as lender/grantee, the amount she would have owed is only the amount of the original debt owed on the Fleet Mortgage, the Court concludes that reaching that conclusion would be inequitable and would result in a windfall to Grant.

[79] *See supra* note 35.

requires Huggins to reconvey the Property to Grant upon her completion of the agreed-upon payments. This factor also supports a finding that an equitable mortgage was created.

### 3. *Previous Negotiations of Parties*

Prior to the transaction, Huggins and Grant were strangers to each other. Huggins approached Grant, unsolicited, and represented to her that he would help save her home from foreclosure in exchange for payments of $219.00 per month. Huggins did not express any intention to reside in or take possession of the Property at the time of the conveyance and Grant did not express any intention to sell her family home prior to executing the 1998 Contract. As previously discussed, the parties dispute what was said between them at the time of the transaction. Huggins testified that he approached Grant to see if she wanted to sell the Property. Grant testified that Huggins said he was her "guardian angel" and offered to help save her home from foreclosure by paying for the foreclosure and she could pay him back. According to Grant, she did not agree to sell her Property and would not have agreed to do so because it had been her family home for many years.

In *Hamlin*, the South Carolina Supreme Court listed factors that are used to determine whether or not a sale was in fact intended: (1) "That there was no evidence that the owner desired to sell or that the lender desired to purchase"; (2) "That during the negotiations nothing was said about a sale of that property"; (3) "That no price was fixed as a selling value of the property and no discussion along that line was had"; (4) "That no attempt was made to ascertain the real value of the property upon which a sale would reasonably be based, greater liberality being exercised when a loan was intended"; and (5) "That the grantees made no inquiry as to the value of the land." *Id.* at 704 (citing *Mason v. Finley,* 124 S.E. 780, 783 (S.C. 1924)).

The application of these factors in this case leads the Court to conclude that a sale of the Property was not intended by the parties. While there is some evidence indicating a sale may have been intended, including Huggins' testimony that he asked Grant to sell the Property, the 1998 Contract is labeled as a "Real Estate Sale Contract," and the 1998 Contract states "[t]he buyers agree to purchase the property" and "[s]ellers fully understand and agree that by the execution hereof and its acceptance of the consideration stated above, the real property described herein is legally sold and the buyer shall own the said property . . . , the evidence that a sale was not contemplated is much stronger.  Notably, Grant testified she never intended to sell her house, and the testimony of the parties indicates that no value or price for the Property was ever discussed, no appraisal of the Property was conducted, and no lease agreement was discussed between them at the time of the transaction.  Consistent with the parties' testimony regarding their dealings prior to its execution, the 1998 Contract reflects that the parties intended for the transaction to serve the purpose of saving Grant's home from foreclosure by providing "[t]his contract is subject to buyer being able to save seller from foreclosure," which is more consistent with a lender-borrower relationship than an outright sale.  The 1998 Contract, however, incongruously provides for Grant's outright sale of the Property to Huggins for $1.00, subject to an outstanding mortgage in the amount of approximately $7,961.34.  The Contract further provides that "possession of the herein described real estate shall be given to the buyer(s) Scott Huggins" but then allows Grant to continue to occupy the Property as optionee "pursuant to the terms of the option agreement executed with the deed," which requires her to make monthly payments to Huggins for 30 years.[80] When considering the totality of the evidence, the fact that Huggins was the drafter of these

---

[80] Pl. Ex. 2.

documents, and the party's testimony, the Court finds that the negotiations between Huggins and Grant do not indicate that a sale of the Property was contemplated.

### 4. *Adequacy of Consideration*

In *Hamlin,* the South Carolina Supreme Court stated that "if the consideration passing between the parties, or the amount to be paid by the grantor on exercising his right to repurchase, would be fairly proportioned to the value of the property, if considered as a debt or loan secured by a mortgage thereon, but grossly inadequate if regarded as the price of the land on an absolute sale, this will tend strongly to show that a sale could not have been intended, but the transaction should rather be treated as a mortgage." *Id.* at 705. The stated consideration for the conveyance of the Property was $1.00, according to the 1998 Contract, the February 1998 Quit Claim Deed, and the July 1998 General Warranty Deed. As discussed above, the 1998 Contract further provided that Huggins agreed to purchase the Property subject to the outstanding mortgage and to pay all costs necessary to bring the mortgage current, including interest payments, late charges, abstract costs, court costs, and attorney's fees up to but not to exceed $4,500.00. At the time of the transaction, according to the affidavit recorded with the February 1998 Quit Claim Deed,[81] the outstanding mortgage lien on the Property was approximately $7,961.34.[82] According to Charleston County property tax records from 1998, the Property had an appraised value of approximately $57,400.00 at the time of the transaction.[83] Even taking the largest figure for the consideration transferred at the time of the transaction—the assumption of the outstanding mortgage balance of $7,961.34 plus $1.00 in cash (as opposed to $4,500 plus $1.00)—the amount transferred to Grant represents only 13.9% of the value of the property transferred. As part of the

---

[81] Pl. Ex. 27.
[82] Huggins ultimately paid $11,985.68 to pay off the mortgage at some point in March of 1998.
[83] Pl. Ex. 16.

same transaction, Grant incurred an additional liability of $78,840.00 in exchange for the option to repurchase the Property when she completed the payments. *See Mason v. Finley*, 124 S.E. at 784 (finding that "[a]nother significant circumstance showing that a sale was not contemplated is the inadequacy of the price which is claimed to have been agreed upon" and noting that paying $100.00 for an interest in property worth close to $900.00 was a factor weighing in favor of finding the transaction to be an equitable mortgage). The Court finds that the significant disparity between the value of the Property and the consideration received by Grant for the transfer supports a finding that an equitable mortgage, rather than an outright sale to Huggins, was created by the transaction.

### 5. *Dealings of Parties*

"[A]nother indicia of customary and normal course of dealings which gives aid in determining the intention of the parties is how the contract between the parties to the transaction originated, and if the grantor attempted to borrow money at the inception of the transaction." *Id.* (citing *Mason v. Finley,* 123 S.E. at 785-86.) In other words, the Court should analyze whether the dealings between the parties were those of a creditor and debtor rather than a buyer and seller. Unlike *Hamlin*, this transaction did not appear to arise from a request from Grant to borrow funds from Huggins. Grant testified that she was considering seeking a loan from relatives but did not make such a request before Huggins approached her and offered to help save her home from foreclosure. The express language of the 1998 Contract, however, indicates that their agreement was predicated upon Huggins saving her home from foreclosure.[84] This language is inconsistent with Huggins' claim that the parties intended for Grant to be fully divested of her ownership interest in the Property as a result of the transaction.

---

[84] Pl. Ex. 2 (providing that "[t]his contract is subject to buyer being able to save seller from foreclosure.")

6.   *Terms of Contract to Reconvey*

The Court further considers whether any of the terms of the contract to reconvey indicate that the Property was intended to serve as security for a debt.  The Option Agreement requires Grant to make payments of $219.00 per month for 360 months and further provides that upon payment in full, Grant shall have the right to purchase the Property for $10.00, plus closing costs and other incidental expenses, and subject to the existing mortgage in favor of Fleet Mortgage Corp.  The duration of the agreement is indicative of a loan, as a 30-year term is common for a mortgage.  In addition, the Option Agreement states that "[i]t is further agreed that the sellers shall have the right to sell, assign, mortgage, lease or otherwise encumber said real estate subject to this option."  It would appear unnecessary to include such a provision if Huggins believed he had full fee simple title to the Property from Grant and therefore possessed all the rights attendant to full title, including the right to mortgage or encumber the Property.  This factor weighs in favor of finding an equitable mortgage was created.

In reaching its conclusion that Grant has met her burden to show that the 1998 Contract, coupled with the Option Agreement, was not intended as an outright transfer of the Property to Huggins, but rather the transaction was in the nature of an equitable mortgage, the Court also considered evidence introduced into the record which does not fall squarely into factors (1) through (6) above.  In particular, the Court notes that Grant has continued in possession of the Property after the execution of the deed for 25 years.  Huggins had minimal contact with Grant during this time period.[85]  The evidence indicates that after the transaction was completed in 1998, Huggins did not speak with Grant until June of 2016, or at most had minimal contact with her.  Since 1998,

---

[85] As mentioned above, Grant testified that after completing the transaction in July of 1998, she did not hear from Huggins again until June of 2016.  Huggins indicated that he communicated with Grant from time to time after the transaction to have insurance inspections completed.

Grant has maintained and made improvements to the Property.  No evidence was presented indicating that Huggins reimbursed Grant for those improvements or paid for any improvement or maintenance of the Property.

Though Huggins has paid most of the taxes and insurance on the Property as an owner would, it appears Grant reasonably believed that taxes and insurance were included in her payments to Huggins.  Prior to the execution of the 1998 Contract, it appears that property taxes and insurance were escrowed by Fleet Mortgage and were covered by Grant's monthly mortgage payment.[86]  While the Option Agreement did not expressly address the payment of taxes and insurance, it contemplated that the Property would continue to be subject to the mortgage held by Fleet Mortgage.  Similarly, the 1998 Contract provided that Huggins would bring the mortgage on the Property current but did not indicate that the mortgage would be paid off.  After paying off the Fleet Mortgage, thereby terminating the escrow, Huggins paid the property taxes and insurance from 1998 through 2016.  Grant paid the taxes for 2017 and 2018 when she received notice that the taxes had not been paid, but she testified that she did not know who was paying the taxes on the Property prior to that time.  Viewed together, these other factors also weigh in favor of finding that an equitable mortgage was created in favor of Huggins as lender/grantee.

### b. Admissibility of the Holographic Statement

In support of his position that he and Grant did not intend for the 1998 Contract and Option Agreement to be an equitable mortgage, Huggins presented into evidence Plaintiff's Exhibit 3—a

---

[86] *See* Def. Ex. C ("The buyers agree to purchase the property subject to an outstanding mortgage in the amount of approximately $7,961.34 as of June 1, 1997 payable to Fleet Mortgage Corp. in monthly installments of $136.20 including principal, interest (at 7%), tax and insurance."); Def. Ex. A (Copy of Mortgage from Andrew Grant and Louise Grant to Carolina National Mortgage Investment Co. Inc., dated May 30, 1973, attached to Complaint for Foreclosure of Real Estate Mortgage filed by Fleet Mortgage Corp. against Louise Grant and Andrew Grant, filed on December 18, 1997 in the Court of Common Pleas for Charleston County, C/A No. 97-CP-10-5667).

handwritten statement dated January 13, 1998, purportedly signed by Grant and notarized, providing that:

> I Louise Grant fully understand that I am selling my home to Scott Huggins, no one has promised me a loan. There is no intent to make or receive a loan by either party. This is an option and option to repurchase only. I have read and fully understand the terms of the Real Estate Sales Contract, the Option Agreement, and the quit claim deed and have waived my right to have an attorney explain them to me.[87]

Grant objected to the admission of Exhibit 3 on grounds that it is barred by the parol evidence rule because both the 1998 Contract and Option Agreement contain merger clauses. Huggins asserts that the statement is a holographic statement, and that Grant prepared the handwritten portion of the document. Although he testified that he was present at the time the statement was signed, he could not recall where it was signed. Grant acknowledged that the statement appeared to include her signature but testified she did not recognize the handwritten portion of the statement, it was not her handwriting, and she would not have signed it. Grant claimed that "there was lots of forgery going on." She testified that Huggins told her she did not need an attorney. Accordingly, the Court took the admission of Plaintiff's Exhibit 3 under advisement.

Grant disputes the statement's authenticity and contends that consideration of this statement is barred by the parol evidence rule, especially due to the inclusion of a merger clause in both the 1998 Contract and Option Agreement.[88]

> "The parol evidence rule prevents the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to execution of a written instrument when the extrinsic evidence is to be used to contradict, vary, or explain the written instrument." *Gilliland v. Elmwood Props.*, 301 S.C. 295, 302,

---

[87] Pl. Ex. 3.

[88] The merger clause in the 1998 Contract provides: "Both sellers and buyers agree that this written contract constitutes the entire agreement between the parties and that there are no other agreements or understanding except as mentioned herein." Pl. Ex. 2. The merger clause in the Option Agreement provides: "This constitutes an agreement in entirety between the parties." Pl. Ex. 1.

391 S.E.2d 577, 581 (1990) (citing *Iseman v. Hobbs*, 290 S.C. 482, 483, 351 S.E.2d 351, 352 (Ct. App. 1986)).  " 'Where an agreement is clear on its face and unambiguous, the court's only function is to interpret its lawful meaning and the intent of the parties *as found within the agreement*.' "  *Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 409 S.C. 568, 577, 762 S.E.2d 696, 700 (2014) (emphasis added) (quoting *Miles v. Miles*, 393 S.C. 111, 117, 711 S.E.2d 880, 883 (2011)).  " 'Interpretation of a contract is governed by *the objective manifestation of the parties' assent at the time the contract was made*, rather than the subjective, after-the-fact meaning one party assigns to it.' " *N. Am. Rescue Prods., Inc. v. Richardson*, 411 S.C. 371, 378, 769 S.E.2d 237, 241 (2015) (emphasis added) (quoting *Laser Supply & Servs., Inc. v. Orchard Park Assocs.*, 382 S.C. 326, 334, 676 S.E.2d 139, 143–44 (Ct. App. 2009)).

*Rodarte v. Univ. of S.C.*, 799 S.E.2d 912, 917-18 (S.C. 2017).  The South Carolina Supreme Court has stated that "where a contract is ambiguous, parol evidence is admissible to ascertain the true meaning and intent of the parties."  *Penton v. J.F. Cleckley & Co.,* 486 S.E.2d 742, 745 (S.C. 1997) (citing cases).  A contract is ambiguous where it is "capable of being understood in more ways than just one or unclear in meaning because it expresses its purpose in an indefinite manner." *Id.*  However, "when a merger clause exists that expresses the parties' intention to treat the agreement as completely integrated, the terms of the agreement cannot be altered by parol evidence."  *Gee v. Delta Speir Plantation LLC*, 390 F. Supp. 3d 645, 650 (D.S.C. 2019) (citing *Wilson v. Landstrom*, 281 S.C. 260, 315 S.E.2d 130, 134 (Ct. App. 1984)), *aff'd*, No. 20-1852, 2022 WL 575589 (4th Cir. Feb. 25, 2022).  The determination of whether a contract with a merger clause encompasses the entire relationship between the contracting parties "is a factual question of intent, and evidence of terms understood by the parties but not covered by the contract is probative of that intent." *Ctr. State Farms v. Campbell Soup Co.,* 58 F.3d 1030, 1033 (4th Cir. 1995) (applying South Carolina law); *see also Frewil, LLC v. Price,* 769 S.E.2d 250 (S.C. Ct. App. 2015) (finding that if a writing on its face appears to express the entire agreement between the parties, parol evidence cannot be admitted to add another term thereto, but when a contract is silent as to a particular matter, and

ambiguity thereby arises, parol evidence may be admitted to supply the deficiency and establish the true intent).

Both Huggins and Grant agree that the 1998 Contract and Option Agreement are ambiguous. The fact that litigation over the terms of these agreements and their meaning has spanned the course of the last five years itself is strong evidence of the documents' ambiguity. The Court thus finds that parol evidence, including the holographic statement, is admissible to determine their intent regarding these agreements. Nevertheless, while the holographic statement is admitted into evidence, the Court finds this document should be given little weight. While it is notarized, its reliability has been called into question. Huggins testified that Grant prepared the holographic statement, but Grant denied preparing the statement. The original of the document was not presented into evidence, and the testimony was unclear whether Grant in fact signed it. Grant appeared to acknowledge that the signature on the document looked like her signature, but she testified that she neither wrote nor recognized the handwritten portion and would not have agreed to that language. The Court finds her ability to draft such a legal document highly questionable. Even if she wrote the statement, it is highly unlikely that the content of the statement was prepared by her, especially considering one-sided nature of the statements contained therein. Like the other documents associated with this transaction, Huggins likely provided some form language or dictated the language and therefore the document should be construed against him. Grant testified that she never would have agreed to sell her home. Considering the holographic statement together with the 1998 Contract, the Option Agreement, the credibility of the witnesses, the sophistication of the respective parties, and other evidence before it, the Court concludes that the weight of the evidence supports a finding that the transaction created an equitable mortgage, which Huggins cannot rebut.

    **c. The Statute of Limitations Defense Is Inapplicable to Grant's Claim of Equitable Mortgage**

Huggins raised a statute of limitations defense to Grant's claim for an equitable mortgage on the Property, including S.C. Code Ann. §§ 15-3-350 (3-year statute of limitations for an action upon a contract); 15-3-340 (adverse possession statute of limitations); and 15-3-350 (10-year statute of limitations for claim of ownership of property).  Statutes of limitations are not applicable to Grant's claim to the property via an equitable mortgage because it is equitable in nature.  *See Thomerson v. DeVito*, 844 S.E.2d 378, 381 (S.C. 2020) (quoting *Dixon v. Dixon*, 608 S.E.2d 849, 855 (S.C. 2005)) ("This Court has held that the statute of limitations does not apply to actions in equity."); *Parr v. Parr*, 231 S.E.2d 695, 699 (S.C. 1977) (holding that because plaintiffs' action was equitable in nature, statutes of limitations were inapplicable) (citing cases); *Parrott v. Dickson*, 148 S.E. 704, 707 (S.C. 1929) (citing *Fanning v. Bogacki*, 98 S.E. 137 (S.C. 1919)) ("Certainly, the statute of limitations is not applicable, since this is a case in equity."); *Blackwell v. Ryan*, 21 S.C. 112, 121 (1884) (holding that statutes of limitations are inapplicable to an equitable action for specific performance).  In South Carolina, "[a]n equitable mortgage is a transaction that has the intent but not the form of a mortgage which the court will enforce *in equity* to the same extent as a mortgage."  *Walker v. Brooks,* 778 S.E.2d 477, 479 (S.C. 2015) (emphasis added) (quoting 59 C.J.S. *Mortgages* § 71).  Accordingly, because an action for equitable mortgage is an action in equity, any state law statutes of limitation are inapplicable.

    **d. Laches Is Not a Plausible Defense to Grant's Claim of Equitable Mortgage**

Huggins has also raised the defense of laches to Grant's equitable mortgage claim.  Laches is an equitable doctrine defined as "neglect for an unreasonable and unexplained length of time, under circumstances affording opportunity for diligence, to do what in law should have been done." *Myers v. Town of Calhoun Falls,* 892 S.E.2d 514, 518 (S.C. Ct. App. 2023) (internal

quotations omitted) (quoting *Historic Charleston Holdings, LLC v. Mallon,* 673 S.E.2d 448, 456 (S.C. 2009)).   To establish laches as a defense, a party must show that the complaining party unreasonably delayed its assertion of a right, resulting in prejudice to the party asserting the defense. *Id.* (citation omitted).  Notably, delay in the assertion of a right does not, in and of itself, constitute laches; rather, '[s]o long as there is no knowledge of the wrong committed and no refusal to embrace opportunity to ascertain facts, there can be no laches.'" *Mid-State Tr., II v. Wright*, 474 S.E.2d 421, 423 (S.C. 1996) (quoting *Archambault v. Sprouse*, 63 S.E.2d 459 (S.C. 1951)). Said differently, "[t]he failure to assert a right 'does not come into existence until there is a reason or situation that demands assertion.'" *Id.* (quoting *Ex parte Stokes*, 182 S.E.2d 306 (S.C. 1971)). The burden to prove laches rests on the party seeking to use it as a defense. *Myers*, 892 S.E.2d at 518-19 (quoting *Jenkins v. Refuge Temple Church of God in Christ, Inc.*, 818 S.E.2d 13, 20 (S.C. Ct. App. 2018)).  "[W]hether laches applies in a particular situation is highly fact-specific, so each case must be judged on its own merits." *Wright*, 474 S.E.2d at 423-24 (citing *Jefferson Pilot Life Ins. Co. v. Gum*, 302 S.C. 8, 393 S.E.2d 180 (1990)).

For laches to apply, Huggins must show that the complaining party—Grant— unreasonably delayed her assertion of a right, resulting in prejudice to him.  A mere delay in time does not constitute laches.  Under the terms of the Option Agreement, Grant had the right to exercise her purchase option at any time "on or before February 2028."  It further provides that "no prepayment accepted unless for the full term of the contract," which was 360 months or $78,840.00.  Grant did not attempt to exercise her purchase option until June of 2019, after she had made $78,718.00 in payments plus payments of taxes in the total amount of $4,223.30, which she was not obligated to pay under the terms of the Option Agreement.  Following Huggins' refusal to transfer the deed to the Property to her, Grant immediately sought assistance from counsel to

assert her rights in the Property in state court. Grant's delay in asserting rights to the Property under the Option Agreement until June of 2019 is not unreasonable in light of the express terms of the agreement between the parties.

In *Wall v. Huguenin,* the South Carolina Supreme Court concluded that laches did not bar the exercise of an option to repurchase property by vendor's children 13 years after its execution where the option specifically provided that the time of its exercise be convenient to vendor. 406 S.E.2d 347, 349 (S.C. 1991). In finding that laches did not apply, the Supreme Court noted that the personal nature and sentimental value of the property was a persuasive factor. *Id.* at 350. Similarly, in this case, the evidence indicates that the Property has been Grant's home for more than fifty years and is where she raised her eight children; thus, it has highly personal value to her and her family. In *Hamlin,* the court similarly concluded that laches did not apply despite the party's delay of 13 years in asserting his claim that a deed was in fact a mortgage, noting that "[d]elay in ascertaining an absolute deed to be a mortgage has not the same effect upon the rights of the parties that attends delay in seeking to enforce in equity the performance of an executory contract. Once a mortgage, always a mortgage, is the maxim of the law and payment does not stand on the footing of performance in equity."

Based on this precedent and for the reasons stated above, the Court finds that the defense of laches does not apply to bar Grant's equitable mortgage claim.

### e.  Declaration of Equitable Mortgage

Based on the foregoing, the Court finds that Grant has presented sufficient evidence indicating that the transfer of the Property to Huggins was intended only to secure a debt. Huggins has failed to present convincing evidence to the contrary. Accordingly, the Court concludes that the transaction between Huggins and Grant, represented by the 1998 Contract, Quit Claim Deed,

and Option Agreement, was in fact an equitable mortgage from its inception. As discussed more fully below, the subsequent dealings between Huggins and Grant, including the execution of the General Warranty Deed and 2016 Amendment, did not change the nature of this transaction, as no additional consideration was provided. Under South Carolina law, "[o]nce a mortgage, always a mortgage, unless there is additional consideration for any change made." *Hamlin,* 257 S.E.2d at 708 (quoting *Leland v. Morrison,* 75 S.E. 889 (S.C. 1912)). The Court further concludes that Grant has fully repaid her debt obligation secured by the equitable mortgage and is entitled to have title to the Property restored in her name.

### IV.     The Option Agreement Is Not an Installment Land Contract, but Even if It Was, the Outcome of this Proceeding Would Be the Same

Huggins initially asserted and testified that he believed the Option Agreement was a lease with the option to purchase the Property. As the proceedings evolved, Huggins has taken the position that the transaction between the parties is more appropriately defined as an "installment land contract," which is also known as a "contract for deed." "A contract for deed is a contract for the purchase and sale of real estate under which the purchaser acquires the immediate right to possession of the real estate and the vendor defers delivery of a deed until a later time to secure all or part of the purchase price." *See* RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 3.4 (1997). Often called a "poor man's mortgage," these types of agreements allow the purchaser to obtain immediate possession of the real property being purchased and to pay the purchase price for real property over time in a series of installments. *Lewis v. Premium Inv. Corp.*, 351 S.C. 167, 170, 568 S.E.2d 361, 363 (2002) (citing 15 Richard R. Powell, Real Property 84D.01 at 3 (2000); *Ellis v. Butterfield,* 570 P.2d 1334, 1335 (Idaho 1977)). "Typically, the vendor retains legal title to the property until all of the purchase price has been paid. . . ." *Id.* at 363 (citation omitted).

Unlike mortgages, which in South Carolina must be foreclosed using the judicial foreclosure process when the holder seeks to recover its collateral, the seller under an installment land contract can typically avoid the judicial foreclosure process upon the purchaser's default by including a forfeiture clause in the agreement. *Id.* "Installment contracts almost always contain forfeiture clauses. When enforced, these clauses enable the vendor to terminate the contract, recover the property, and retain all installments paid when the purchaser defaults." *Id.* (citation omitted). However, the South Carolina Supreme Court has held that a provision in an installment land contract declaring forfeiture in the event of a purchaser default can, in particular circumstances, constitute a penalty. *Id.* at 364. Under those circumstances, the Supreme Court recognized an equitable right of redemption, concluding that "it would be inequitable to enforce the forfeiture provision without first allowing the purchaser an opportunity to redeem the installment contract by paying the entire purchase price." *Id.* "A right of redemption is an opportunity to pay the entire debt in full to avoid a forfeiture." *In re Kingsmore,* 295 B.R. 812 (Bankr. D.S.C. 2002) (citing *Lewis v. Premium Inv. Corp.*, 351 S.C. 167, 568 S.E.2d 361, 364-65 (S.C. 2002)). As directed by *Lewis,* courts have applied a series of factors to consider when determining whether redemption is equitable under the circumstances:

> (1) the amount of the purchaser's equity, (2) the length of the default period, (3) the number of defaults, (4) the reason for delay in payment, (5) the speed in which equity is sought, (6) the value of improvements to the property, (7) the amount of money forfeited compared to the purchase price, (8) the adequacy of the property's maintenance and (9) the relationship of monthly payments to the fair rental value of the property.

*In re Kingsmore,* 295 B.R. at 819.

As discussed above, the parties agree that the Option Agreement is ambiguous. The Option Agreement does not precisely fit the mold for a typical installment land contract because at the beginning of the transaction Grant was already the title owner of the Property and possessed

significant equity in the Property. Typically, installment land contracts are used where a buyer is acquiring property and paying the purchase price in installments—which is not the case here. For the reasons outlined in the prior section of this Order, the Court concludes the transaction is best classified as an equitable mortgage. The outcome of this Adversary Proceeding, however, would not change even if the Court sided with Huggins' arguments that the Option Agreement is an installment land sale contract. In that case, Grant would have an equitable right of redemption— which she first attempted to exercise when she requested the deed from Huggins in 2019—because the forfeiture of the equity she has in the Property would constitute a penalty. The Option Agreement sets forth a series of monthly payments that must be made to obtain the Property. It also contains a forfeiture clause in the event Grant defaults on those payments. Grant has paid $78,718.00 to Huggins plus $4,223.30 in taxes for the Property that Huggins failed to pay, which together exceeds the total payment obligation under the Option Agreement. The Option Agreement expressly provides that prepayments would be accepted for the full term, and upon full prepayment, Huggins was required to reconvey the Property to Grant for ten dollars plus costs.

The Court concludes that, even assuming that the Option Agreement is an Installment Sale Contract under South Carolina Law, Grant would have an equitable right of redemption which she first attempted to exercise when she requested the deed from Huggins in 2019. If the Court enforced the forfeiture provision, Grant would lose her home of 50 years along with the equity she held at the time of the transfer of approximately $50,000.00, the $82,941.50 she paid to Huggins for the Property, including the taxes she paid for the Property on his behalf, and the costs of improvements she made to the Property (*i.e.*, repainting, electrical, plumbing, and roof repairs)[89] during the term of the Option Agreement. On the other hand, Huggins would obtain Property

---

[89] No evidence was submitted of the cost of these repairs.

worth approximately $442,000.00, for which he paid a total of $70,658.06, consisting of the $1.00 consideration recited in the 1998 Contract, the Fleet Mortgage payoff in the amount of $11,985.68, and insurance and taxes totaling $58,671.38.  Huggins also received the benefit of funds borrowed and secured by mortgages on the Property but remains personally obligated for the debt secured by the Property, the balance of which is approximately $50,394.56.  Huggins made no repairs or improvements to the Property during the term of the Option Agreement.  Grant consistently and timely made her monthly payments under the Option Agreement, without default, until June of 2019 when she believed she had paid the obligation in full.  Upon completion of the obligation, Grant immediately demanded the deed from Huggins.[90]  No evidence was presented regarding the fair rental value of the Property to allow the Court to compare the monthly payments with the fair rental value.  When considering these factors, it appears that enforcement of the forfeiture provision would constitute a penalty to Grant.

Huggins asserts that Grant's right to redeem the Property is barred by judicial estoppel because she failed to list the Property in her bankruptcy schedules.  For the reasons discussed above, the Court finds that judicial estoppel does not apply, and Grant would have been able to assert an equitable right of redemption and redeem the Property by payment in full of any amounts due under the Option Agreement had the Court concluded that the 1998 Contract and Option Agreement constituted an installment land contract.

## V.    Effect of Grant's Bankruptcy Filing in 2013 on the Option Agreement

As a lien on the Property, an equitable mortgage would pass through Grant's bankruptcy case unaffected unless otherwise provided for in the plan.  *See In re Washington,* 529 B.R. 654,

---

[90] In *Kingsmore*, the court found that an attempt to pay the redemption amount is not required in order for purchasers to obtain an equitable right of redemption.  *Id.* at 819.  Instead, "the equitable right of redemption exists when equity dictates it based upon the presence of some or all of the factors listed in *Lewis*." *Id.*  "The right of redemption arises out of equity and is the debtor's last chance to save the property." *Id.* at 820 n.10.

663 (Bankr. D.S.C. 2015) (stating that "the law is well settled that a lien passes through bankruptcy despite discharge unless voided by a plan or court order.") (citing cases).  Grant did not address Huggins' claim or interest in the Property in her Chapter 13 plan.  Accordingly, the lien arising from the equitable mortgage remains on the Property despite Grant's prior discharge.

Even if the Option Agreement constituted an installment land contract, as argued by Huggins, it would likewise remain viable despite Grant's bankruptcy filing.  Huggins argues that the Option Agreement was rejected during Grant's bankruptcy case because she did not list it as an executory contract to be assumed in her confirmed plan; therefore, it was deemed rejected under the language of the form plan.  This Court has previously concluded that an installment land contract is an executory contract under 11 U.S.C. § 365.  *See id.* at 821-27.  However, rejection of an executory contract does not terminate the contract—it merely constitutes a breach of that contract.  11 U.S.C. § 365(g); *see also Cromwell Field Assoc., LLP v. May Dept. Stores Co.*, 5 F. App'x 186, 190 (4th. Cir.2001); *In re Ducane Gas Grills, Inc.*, 320 B.R. 324, 337 (Bankr. D.S.C. 2004).  "Rejection does not change the substantive rights of the parties to the contract, but merely means the bankruptcy estate itself will not become a party to it."  *In re Alongi*, 272 B.R. 148, 153 (Bankr. D.Md. 2001) (quoting Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U. COLO. L. REV. 845 (1988)).  "The rights and obligations of a debtor and a non-debtor party to an executory contract are essentially the same after rejection of the contract as they would have been if the contract had been breached by the debtor prepetition." *Id.* at 154.

Although Grant's failure to assume the Option Agreement in her Chapter 13 bankruptcy would constitute a technical breach under the Bankruptcy Code, the breach would be immaterial because (1) Grant was not in default under the terms of the Option Agreement at the time of filing

the petition and there was no default to be cured; (2) Grant continued to timely perform her obligations under the Option Agreement during and after her bankruptcy case; (3) Huggins continued to accept payments during the course of the bankruptcy and thereafter; and (4) Huggins did not incur any damage as a result of the technical breach.[91]  *See In re Lucash,* 370 B.R. 664, 670 (Bankr. E.D. Va. 2007); *In re Park,* 275 B.R. 253, 258 (Bankr. E.D.Va. 2002).[92]  While Huggins' rejection argument is moot because the Court concludes the Option Agreement is an equitable mortgage, the Court finds that even if the Option Agreement constituted an installment land contract and was deemed rejected as of the date that Grant filed her Chapter 13 bankruptcy case, the rejection would not have terminated Grant's rights under the Option Agreement or Huggins' obligations to perform under the Agreement, and that Grant would have had the right to exercise her right to redeem the Property.

## VI.  Calculation of the Amount Necessary to Satisfy the Equitable Mortgage

Grant asserts that she has fully satisfied her obligations under the Option Agreement and is entitled to an order directing Huggins to convey the Property back to her.  An equitable mortgage is satisfied upon payment of the underlying indebtedness.  *See Hamlin,* 257 S.E.2d at 709.  Huggins asserts that the amount that remains to be paid to him is $233,742.15, based in part upon Grant's execution of the 2016 Amendment, which provided for an increase in the option payment amount to $860.00 per month and that "future payments will include taxes, insurance, loan payments and

---

[91] Huggins concedes that the parties continued performance under the Option Agreement likely revived the contract. *See* Plaintiff's Pretrial Brief, ECF No. 42, p. 14.

[92] Similarly, the South Carolina Supreme Court has held that "a lease may not be forfeited for a trivial or technical breach even when the parties have specifically agreed that 'any breach' gives rise to the right of termination", adopting the majority rule that the " 'landlord's right to terminate is not unlimited and that the court's decision to permit termination must be tempered by notions of equity and common sense.' " *Kiriakides v. United Artists Commc'ns., Inc.,* 440 S.E.2d 364, 366 (S.C. 1994) (citations omitted).  Accordingly, any immaterial breach of the Option Agreement would not warrant its recission.

maintenance and/or other expenses associated with the [P]roperty."[93] As previously discussed, the
Option Agreement provided that if Grant fulfilled all of its terms, conditions and stipulations, she
would have the right to purchase the Property "for the sum of $10 (ten dollars) plus all closing
costs and other expenses incidental to the purchase of the [Property] including, but not limited to
maintenance costs, improvement costs, and legal fees and subject to an existing mortgage in favor
of Fleet Mortgage Corp, which balance was approximately $7,961.34."  The repayment of taxes
and insurance were not expressly addressed in the Option Agreement.

Huggins claims that the amount Grant owes him is calculated as follows:[94]

| | |
|---|---|
| Payoff of the Fleet Mortgage: | $11,985.68 |
| Outstanding 2016 Amendment Payments: | $88,580.00 |
| Attorney's fees: | $74,505.09 |
| Taxes: | $27,469.44 |
| Hazard Insurance: | $21,026.94 |
| Flood Insurance: | $10,175.00 |
| **Total:** | **$233,742.15** |

Grant asserts that the 2016 Amendment is unenforceable because it lacked new and
independent consideration. Therefore, she asserts that she is not obligated to pay the outstanding
2016 Amendment Payments, taxes, or insurance.  As to attorney's fees, Grant asserts that the only
attorney's fees she is obligated to pay under the terms of the Option Agreement are those
"incidental to the purchase of the [Property]," such as attorney's fees for the preparation of the
deed transferring the Property from Huggins back to Grant and closing of that real estate
transaction.

---

[93] Pl. Ex. 8.  Read together with the Option Agreement, the $860.00 payment would be required to be paid monthly
until February of 2028.
[94] Pl. Ex. 24.

As of July 2016, Grant had 138 payments of $219.00 remaining under the 1998 Contract, totaling approximately $30,222.00.  The 2016 Amendment purported to modify the terms of the Option Agreement by increasing Grant's payments to $860.00 per month for the remaining 138 months of the term, for a total of $118,680.00.  In other words, this modification added over $88,000.00 to Grant's obligation to Huggins.  While Huggins testified that Grant could have continued under the original Option Agreement, Grant thought she had no choice but to sign the 2016 Amendment if she wanted to buy her house back from him.  For the reasons set forth below, the Court finds that the 2016 Amendment is unenforceable.

### a. Enforceability of 2016 Amendment

The express terms of the Option Agreement do not provide Huggins with authority to unilaterally increase the amount of the monthly payments or the total payoff, which Huggins acknowledged during trial.  Therefore, under South Carolina law, consideration is required for the 2016 Amendment to be enforceable.  "A modification of a written contract must fulfill all of the elements required for a valid contract."  *Roberts v. Gaskins,* 486 S.E.2d 771, 773 (S.C. Ct. App. 1997) (citing *Player v. Chandler,* 382 S.E.2d 891 (S.C. 1989)); *see also Lee v. Univ. of S.C.*, 757 S.E.2d 394, 398 (S.C. 2014) (quoting *Layman v. State*, 630 S.E.2d 265, 269 (S.C. 2006)) ("Once [a] bargain is formed, and the obligations set, a contract may only be altered by mutual agreement and for further consideration.").  "The elements required for formation of a contract are an offer, acceptance, and valuable consideration."  *Hardaway Concrete Co., Inc. v. Hall Contracting Corp.*, 647 S.E.2d 488, 492 (S.C. Ct. App. 2007) (citing *Sauner v. Pub. Serv. Auth. of S.C.*, 581 S.E.2d 161, 166 (S.C. 2003)).  "Valuable consideration to support a contract may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other."  *Factor King, LLC v. Dooleymack*

*Constructors of S.C., LLC*, No.: 2:17-cv-1845-PMD, 2017 WL 5001289, at *2 (D.S.C. Nov. 2, 2017) (internal quotation marks omitted) (quoting *Plantation A.D., LLC v. Gerald Builders of Conway, Inc.*, 687 S.E.2d 714, 718 (S.C. Ct. App. 2009)).

As the 2016 Amendment does not expressly address consideration, Huggins offered parol evidence to demonstrate that the Amendment did have consideration and is therefore enforceable. Huggins asserts that the 2016 Amendment stopped the accrual of a final balloon payment for taxes and insurance and added Grant's children as optionees, which he asserts constitutes new and valuable consideration. Huggins testified that he explained to Grant that instead of being obligated to pay the taxes, insurance, and other expenses associated with the Property in a lump sum when she exercised the Option, she would now be paying those expenses going forward as part of her increased monthly payment. Moreover, his understanding was that, under the terms of the 2016 Amendment, if something happened to Grant, her two kids would be able to make payments *and* "take over" the contract. On the other hand, Grant understood that under the 2016 Amendment, if something happened to her, her son or daughter could make the payments on her behalf.

The Court notes that in accordance with well-established contract law, since the 2016 Amendment was prepared by Huggins, any ambiguity in that amendment should be construed against Huggins.[95] *See Sagittarius Sporting Goods Co., Ltd. v. LG Sourcing, Inc.,* 162 F.Supp.3d 531, 537 (D.S.C. 2016) (citing *S. Atl. Fin. Servs., Inc. v. Middleton*, 356 S.C. 444, 590 S.E.2d 27, 29 (2003) ("Ambiguous language in a contract ... should be construed liberally and interpreted

---

[95] The Court also notes that the 2016 Amendment on its face does not appear ambiguous; accordingly, an argument also exists that Huggins' interpretation of what was meant, which would clearly vary the plain meaning of the words in the addendum, should be excluded by the parol evidence rule. *Rodarte v. Univ. of S.C.*, 419 S.C. 592, 603, 799 S.E.2d 912, 917-18 (2017) (stating that "where an agreement is clear on its face and unambiguous, the court's only function is to interpret its lawful meaning and the intent of the parties as found within the agreement"); *Dove Data Prods., Inc. v. DeVeaux*, No. 2008–UP–202, 2008 WL 9841167, at *5 (S.C. Ct. App. Mar. 24, 2008) ("[P]arol evidence may be admitted to show a separate and independent agreement which is not inconsistent with the terms of a contemporaneous agreement if it can be inferred the parties did not intend the written paper to be a complete integration of the agreement.") (quoting *Beckham v. Short*, 365 S.E.2d 42, 43 (S.C. Ct. App. 1988)).

strongly in favor of the non-drafting party.")).    Upon a plain reading of the 2016 Amendment,

Grant would pay a higher amount that would cover "taxes, insurance, loan payments and

maintenance and/or other expenses associated with the property" and if Grant was "unable to make

future payments," her children could "continue to make them *on her behalf*."  (emphasis added).

The plain language of the 2016 Amendment does not provide Anthony and Vanessa Grant with

rights to exercise the option—only to make payments on their mother's behalf.  Under the express

terms of the 2016 Amendment, there was no consideration provided by Huggins to Grant in

exchange for the modification of the Option Agreement.  Grant's monthly payments increased by

$641.00, and her total obligation to Huggins increased by over $88,000—more than 200%.  In

return, Anthony and Vanessa Grant were permitted to make payments to Huggins on Grant's

behalf and Grant's ongoing monthly payment would now include taxes, insurance, and other

expenses associated with the Property.  Moreover, Grant's ongoing monthly payment could now

be applied toward "loan payments," ostensibly meaning her payments could be applied towards

loans that Huggins took out against the Property.

    The Court observes that allowing Anthony and Vanessa Grant to make payments on

Grant's behalf does not benefit Grant, as they could have already done so indirectly by giving

money to Grant and then Grant sending the payment to Huggins—or likely even directly—as it

would make no difference to Huggins where the payments came from.  Additionally, it does not

benefit Grant to include taxes, insurance, and other expenses associated with the Property in

ongoing payments, as those expenses appear to have been included in her $219 per month payment

under the original Option Agreement, and nothing was mentioned in the Option Agreement about

adjusting the monthly payment to account for increases in taxes or insurance.  Moreover, it bears

particular notice that part of the insurance costs included flood insurance which apparently became

a requirement after Huggins encumbered the property with the last mortgage.  In short, while the

2016 Amendment increased Grant's payment obligation, it provided no benefit to Grant as she was

already current under the Option Agreement and could have simply exercised the option upon the

completion of its term.    Accordingly, the Court finds that the 2016 Amendment lacks

consideration.

The absence of consideration for the 2016 Amendment renders it void and unenforceable.

*See Hyman v. Ford Motor Co.*, 142 F. Supp. 2d 735, 741 (D.S.C. 2001) (applying South Carolina

law and stating "[l]ike any contract, a release given without consideration is void."); *Poole v.

Incentives Unlimited, Inc.*, 548 S.E.2d 207, 209 (S.C. 2001) (holding a covenant not to compete

unenforceable for lack of consideration); *McMillan v. Evans*, No. 2005–UP–581, 2005 WL

7084837, at *3 (S.C. Ct. App. Nov. 16, 2005) (emphasis added) (citing *Iseman v. Hobbs*, 351

S.E.2d 351, 352-53 (S.C. Ct. App. 1986)) ("If the consideration recited is an act or forbearance, as

distinguished from a promise or covenant, it may be shown that it did not take place and that

therefore the writing is gratuitous and unenforceable. . . ."); *Williams v. Lawrence*, 8 S.E.2d 838,

842 (S.C. 1940) (a mortgage without consideration is "invalid and void"); *see also Cox v. Time

Warner Cable, Inc.*, Nos. 3:12–cv–03333–JFA, 4:12–cv–03407–JFA, 2013 WL 5469992, at *1

(D.S.C. Sept. 30, 2013) (citing *Sauner v. Public Serv. Auth. of S.C.,* 581 S.E.2d 161, 166 (S.C.

2003)) ("Under South Carolina law, contract formation requires an offer, acceptance of the offer,

and consideration.").

The Supreme Court of South Carolina has stated that "some contracts absolutely void *ab

initio* may not be subject to waiver or ratification, where such a contract is forbidden by law; or

perhaps where it violates some established rule of public policy."  *Dubuque Fire & Marine Ins.

Co. v. Miller*, 64 S.E.2d 8, 12 (S.C. 1951) (citations omitted); *Johnson v. Charleston & S. Ry. Co.*,

32 S.E. 2, 5 (S.C. 1899).  This contrasts with contracts that are not void *ab initio* but are merely voidable and capable of being ratified.  *See Hyman*, 142 F. Supp. 2d at 748 (citations omitted) (applying South Carolina law and stating "[a] contract or release which is procured by duress is not void, but merely voidable and is capable of being ratified. . . . It is a well-established proposition that a voidable contract may be ratified by a party's failure to act promptly to repudiate the contract.").  A party's ratification of an otherwise void contract involves accepting or retaining benefits under the contract.  *See Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 608 (S.C. 1962).  Moreover, ratification requires that the party ratifying the otherwise void contract is aware that she is not bound by it but deliberately chooses to proceed under the contract anyway.  *See Small v. Oneita Indus.*, 442 S.E.2d 213, 215 (S.C. Ct. App. 1994) (internal quotation marks omitted) (quoting *Gregg v. Harllee*, 13 S.C.Eq. 42, 53 (1837)) ("[W]ith respect to [ratification], . . . [the ratifying party] must be shown to be no longer under those circumstances. . . which led into the first agreement, and that he was aware that he is not bound by the original contract, but that he may be released from it; but that nevertheless he chooses deliberately and without imposition to [ratify] what he has first done. . . .").

The 2016 Amendment lacked one of the essential elements required for legal enforceability right from the outset—consideration.  Accordingly, it was void *ab initio* and not capable of becoming valid through ratification.  Even if the 2016 Amendment was merely voidable and capable of being ratified, the elements of ratification are not present.  Without consideration from Huggins for the new terms, Grant's performance under the amended terms of the contract did not provide her a benefit as required for ratification.  Moreover, the evidence does not indicate Grant was aware of the contract's invalidity and deliberately chose to proceed thereunder anyway.   For these reasons, the Court concludes that the amount necessary for Grant to satisfy the equitable

mortgage would not include taxes, hazard insurance, flood insurance,[96] or the outstanding payment amounts under the 2016 Amendment.

**b.  Attorney's fees**

Huggins also seeks reimbursement for all attorney's fees he has incurred in connection with the State Court Action and this adversary proceeding in the amount of $74,505.09.  The Option Agreement does not provide for recovery of such fees.  The Agreement merely states that "the sellers give the buyers the right to purchase the herein described real estate for the sum of $10 (ten dollars) plus all closing costs and other expenses *incidental to the purchase of the aforesaid real estate,* including, but not limited to maintenance costs, improvement costs, and legal fees and subject to [the Fleet Mortgage]. . . ."  The term "incidental" is defined as "[a]ccompanying but not a major part of something" or "[l]iable to happen as a consequence of (an activity)" [97]—in this case, the purchase of the Property by Grant through the exercise of the option.  Under a plain reading of this provision, the Court finds that the only recoverable attorney's fees are those necessary to complete the purchase, *i.e.*, the attorney's fees incurred for the execution of the deed to Grant and the real estate closing.

**VI.   Grant's Counterclaims**

**a.  False Pretenses, False Representation, or Actual Fraud (First Counterclaim)**

Grant asserts a counterclaim for false pretenses, false representation, or actual fraud based upon Huggins' misrepresentations in late December 1997 or January of 1998 that he was her "guardian angel" and that he would help save her home from foreclosure, as well as his representations in connection with the 2016 Amendment that she had to sign the Amendment or

---

[96] The Court notes that flood insurance was a requirement of Huggins' lender (Wachovia Bank) when he refinanced the mortgage on the Property in 2001 and was not addressed in the Option Agreement.

[97] *Incidental,* Oxford Dictionaries, https://premium.oxforddictionaries.com/definition/american_english/incidental (last visited Feb. 1, 2024).

she would lose her home.  Grant claims that Huggins preyed on her because of her age, lack of

sophistication, and extreme financial distress, and induced her to enter into a one-sided,

unconscionable agreement and amendment.  She seeks recission of the transaction and return of

the Property to her without encumbrance.  Grant further seeks damages and a determination from

this Court that any damages awarded should be excepted from discharge pursuant to 11 U.S.C. §§

523(a) and § 1328.

> To prove the elements of a fraud claim, the claimant must set forth:
>
> (1) a representation; (2) its falsity; (3) its materiality; (4) knowledge of its falsity
> or reckless disregard of its truth or falsity; (5) intent that the representation be acted
> upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth;
> (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate
> injury.

*In re Foxwood Hills Prop. Owners Ass'n, Inc.,* 650 B.R. 839, 849 (Bankr. D.S.C. 2023) (citing

*Enhance-It, L.L.C. v. Am. Access Techs., Inc.,* 413 F. Supp. 2d 626, 629 (D.S.C. 2006)).  Each of

these elements must be supported by clear and convincing evidence.  *Ardis v. Cox,* 431 S.E.2d

267, 269 (S.C. Ct. App. 1993) ("Fraud is not presumed, but must be shown by clear, cogent, and

convincing evidence.").[98]

> Furthermore, to establish a claim under 11 U.S.C. § 523(a)(2)(A), Grant must prove the

following elements:

> (1) that the debtor made a representation; (2) that at the time the representation was
> made, the debtor knew it was false; (3) that the debtor made the false representation
> with the intention of defrauding the creditor; (4) that the creditor justifiably relied
> upon the representation; and (5) that the creditor was damaged as the proximate
> result of the false representation.

---

[98] Additionally, there are heightened pleading requirements with respect to fraud claims.  Rule 9 requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  In other words, "plaintiffs must particularly allege the who, what, when, where, and how of the alleged fraud."  *U.S. v. Walgreen Co.*, 78 F.4th 87, 92 n.4 (4th Cir. 2023) (internal quotation marks and citation omitted).

*In re Brush,* 460 B.R. 448, 455-56 (Bankr. D.S.C. 2011) (citing cases); *see also Tri-State Surgical Supply & Equip. Ltd. v. McKinnon (In re McKinnon),* 653 B.R. 821 (Bankr. D.S.C. 2023).  As the party seeking a finding of nondischargeability, Grant bears the burden of proof and must prove the foregoing elements by a preponderance of the evidence.  *In re Brush,* 460 B.R. at 456.

From the outset, the Court notes that exceptions to discharge pursuant to § 523 are construed narrowly "to protect the purpose of providing debtors a fresh start."  *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 214, 219 (4th Cir. 2007).  While acknowledging the disparity in sophistication between Huggins and Grant, as well as Grant's vulnerability at the time Huggins approached her due to the financial stress she was under, based on a thorough review of the record before it and the testimony provided by the parties at trial, the  Court finds that the representations made during the parties' initial meeting and thereafter do not rise to the level of fraud.  Grant testified that she remembers Huggins telling her he was her "guardian angel" and that he was going to save her home from foreclosure.  Huggins testified that he could not fully recall what was said.  The evidence indicates there were no other parties present to corroborate either party's version of the events.

Through their testimony, the parties concur that Huggins agreed to save Grant's home from foreclosure and that Grant would make regular payments of $219.00 per month for 360 months.  As a result of Huggins' efforts, the Fleet Mortgage was paid off and the foreclosure action was dismissed.  The evidence presented is insufficient to support a finding that Huggins committed fraud or had the requisite intent to defraud Grant.  There is no evidence of any false representations that were material to the transaction.  Huggins' statement that he was Grant's "guardian angel" is neither a statement upon which Grant had the right to rely nor is it material to the transaction.

Furthermore, the testimony regarding Huggins' alleged representation that Grant had to sign the 2016 Amendment or she would lose her home was contradicted by Huggins.  The parties have different recollections of what exactly was said to induce Grant to sign the 2016 Amendment. Grant has failed to meet her burden to establish fraud under either South Carolina law or the standard of non-dischargeability under 11 U.S.C. § 523(a)(2).   Accordingly, Grant's First Counterclaim must be denied.[99]

      **b.**    **South Carolina Unfair Trade Practices Act ("SCUTPA") (Second Counterclaim)**

Grant claims that Huggins engaged in willful and/or knowingly unlawful and deceptive trade practices in violation of SCUTPA, S.C. Code Ann. § 39-5-10 *et seq.,* including, but not limited to, inducing her to enter into an unconscionable loan transaction and taking advantage of her age, lack of experience in real estate matters, lack of financial sophistication, financial distress and subsequently characterizing the transaction as a "lease" and attempting to evict her from the Property.  To recover on a claim brought under SCUTPA, Grant must demonstrate that (1) Huggins engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) Grant suffered monetary or property loss as a result of Huggins' unfair or deceptive act(s).  *In re Hughes,* 627 B.R. 327, 337 (Bankr. D.S.C. 2021); *In re Russo-Chestnut,* 522 B.R. 148, 156 (Bankr. D.S.C. 2014).  "An unfair trade practice has been defined as a practice which is offensive to public policy or which is immoral, unethical, or oppressive." *In re Hughes,* 627 B.R. at 337 (citing *State ex rel. Wilson v. Ortho-McNeil-Janssen*

---

[99] The Court further observes that as to Huggins' argument that the First Counterclaim is barred by the applicable statute of limitations—S.C. Code Ann. § 15-3-530(7)—which imposes a three-year statute of limitations for fraud actions, the Court does not need to decide whether the affirmative defense is viable because Grant has failed to establish the required elements to prevail on that cause of action.

*Pharm., Inc.*, 777 S.E.2d 176, 188 (2015)) "A deceptive practice is one which has a tendency to deceive." *Id.*

To prevail on a cause of action under SCUTPA, Grant must also prove that the unfair or deceptive practice or act adversely affects the public interest, as conduct that affects only the parties to the transaction does not provide a basis for a claim under SCUTPA—this hurdle has not been met. *In re Hughes,* 627 B.R. at 337-38. An adverse effect on the public can be demonstrated by showing that the acts or practices in question have the potential for repetition. *Id.* (citing *Singleton v. Stokes Motors, Inc.*, 358 S.C. 369, 595 S.E.2d 461, 466 (2004)). In turn, "potential for repetition" may be demonstrated by "showing the same kind of actions occurred in the past, thus making it likely they will continue" or by "showing the [defendant's] procedures created a potential for repetition of the unfair and deceptive acts." *Id.*

While it is unclear to the Court if Huggins' conduct rose to the level of unfairness or deception under this standard, the Court does not need to reach this part of the analysis. Grant's counterclaim is fatally flawed by her failure to demonstrate how the transaction at issue in this case affects the public interest. Huggins testified that this was his first transaction buying a property in foreclosure and he had not done any similar transactions since. Based on the evidence presented, this single transaction does not affect the public interest because it does not show the potential for repetition and was not, in fact, repeated in the ensuing 26 years. Instead, the evidence indicates this transaction was a one-off for Huggins. Accordingly, the Court denies Grant's SCUTPA counterclaim.[100]

---

[100] Similar to the First Counterclaim, Huggins further raised arguments that the Second Counterclaim would be barred by the applicable statute of limitations—S.C. Code Ann. § 39-5-150. Because the Court finds that Grant's SCUTPA Counterclaim fails for the reasons stated above, it is unnecessary to reach the affirmative defense asserted.

### c. Breach of Contract (Third Counterclaim)

Grant asserts that Huggins breached the Option Agreement and 2016 Amendment by refusing to allow Grant to exercise the option to repurchase as provided for in the Option Agreement (or alternatively, to honor her right of redemption) and by failing to pay the taxes on the Property.  Huggins asserts that his refusal to reconvey the Property to Grant was based upon the triggering of the forfeiture clause in the Option Agreement when Grant ceased making payments in July of 2019.  As to the taxes, both Huggins and Grant confirmed through their testimony that Huggins did not pay the taxes for 2017 and 2018.  Huggins testified that he was under the mistaken impression that the mortgage lender, Wells Fargo, paid those expenses on his behalf because he was late on making those payments for those two years.  Grant paid the taxes when she received notice that they were past due.  Huggins argues that Grant did not bring his nonpayment of taxes to his attention when she was required to pay them in 2017 and 2018 and that his breach is defendable by the unclean hands doctrine based upon her failure to inform him that she paid the taxes.  Huggins further argues that the $4,223.30 Grant was required to pay in taxes for 2017 and 2018 is more than offset by the amounts he has paid in taxes and insurance since July of 2019.

Under South Carolina law, "the elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach. *Branche Builders, Inc. v. Coggins,* 686 S.E.2d 200, 202 (S.C. Ct. App. 2009) (citing *Fuller v. E. Fire & Cas. Ins. Co.,* 124 S.E.2d 602, 610 (S.C. 1962)).  "The general rule is that for a breach of contract the defendant is liable for whatever damages follow as a natural consequence and proximate result of such breach" *Id.*  "In a breach of contract action, damages serve to place the nonbreaching party in the position he would

have enjoyed had the contract been performed." *Id.* (citing *S.C. Fed. Sav. Bank v. Thornton-Crosby Dev. Co.,* 399 S.E.2d 8, 10 (S.C. Ct. App. 1990)).  Each element is analyzed, in turn, below.

### i.   *Existence of a Contract*

As discussed above, the Court has previously determined that the 2016 Amendment was unenforceable for lack of consideration and that Grant satisfied her monthly payment obligations under the Option Agreement such that she was entitled to exercise her option to repurchase in July of 2019.  Between the 2016 Amendment and the Option Agreement, the Option Agreement is the only enforceable contract between the parties.

### ii.   *Breach*

Based on the evidence, the Court finds that Huggins breached the Option Agreement when he failed to reconvey the Property to Grant upon her request in 2019.  Under the terms of the Option Agreement, Huggins was to reconvey the Property to Grant for the sum of $10.00 plus costs so long as she paid $219.00 per month, continuing for 360 months, or if she prepaid the full term of the contract. According to the evidence presented, Grant paid the full term of the Option Agreement, yet Huggins refused to reconvey the Property when asked in 2019.

Huggins asserts that Grant's breach of contract claim is barred by the applicable statute of limitations.  S.C. Code Ann. § 15-3-530(1) provides a three-year statute of limitations for "an action upon a contract, obligation, or liability, express or implied, excepting those provided for in Section 15-3-520[.]"  The discovery rule applies to the statute of limitations for breach of contract claims.  *See Wright v. Wells Fargo Bank, N.A.,* No. 6:22-cv-00261, 2022 WL 2668442, at *5 (D.S.C. Apr. 6, 2022).

> According to the discovery rule, the statute of limitations begins to run when a cause of action reasonably ought to have been discovered. *Hedgepath v. [Am.] Tel. & Tel. Co.*, 348 S.C. 340, 559 S.E.2d 327 (Ct. App. 2001).  Under this rule, a cause of action accrues for purposes of the statute of limitations when a plaintiff has

> notice that he might have a remedy for a harm. *Dean v. Ruscon Corp.*, 321 S.C. 360, 468 S.E.2d 645 (1996). The statute runs from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct. *Hedgepath*, 348 S.C. at 355-56, 559 S.E.2d at 336.

*Earthworks Grp., Inc. v. A&K Props. of S.C., Inc.*, No. 4:17-cv-01486-SAL, 2020 WL 1703897, at *8 (D.S.C. Apr. 8, 2020). "This standard as to when the limitations period begins to run is *objective* rather than subjective. Therefore, the statutory period of limitations begins to run when a person *could or should have known*, through the exercise of reasonable diligence, that a cause of action might exist in his or her favor, rather than when a person obtains actual knowledge of either the potential claim or of the facts giving rise thereto." *Allwin v. Russ Cooper Assocs., Inc.*, 426 S.C. 1, 13, 825 S.E.2d 707, 713 (Ct. App. 2019) (emphasis in original) (quoting *Stokes-Craven Holding Corp. v. Robinson*, 416 S.C. 517, 525-26, 787 S.E.2d 485, 489-90 (2016)). The Supreme Court of South Carolina has "'interpreted the 'exercise of reasonable diligence' to mean that the injured party must act with some promptness' when on notice of a potential claim." *Id.* (quoting *Dean v. Ruscon Corp.*, 321 S.C. 360, 363-64, 468 S.E.2d 645, 647 (1996)).

Huggins bears the burden to establish that Grant knew or that a reasonable person in her situation should have known of the facts giving rise to the claim more than three years ago. The record before the Court indicates that Grant attempted to exercise her purchase option in June of 2019. On September 25, 2019, Charleston Pro Bono wrote a letter to Huggins on Grant's behalf requesting the deed to the Property. Huggins then attempted to exercise the forfeiture clause under the Option Agreement by sending a letter to Grant on October 9, 2019, advising Grant that he considered her to be in breach of the agreement, and ultimately filed the State Court Action in August of 2020. Grant filed her breach of contract counterclaim on April 30, 2021. The evidence indicates that the claim was filed within three years of the date that Grant discovered that Huggins

was asserting that she had no right to reclaim the Property.  Accordingly, Grant's breach of contract claim is not barred by the statute of limitations.

      iii.  *Damages*

Grant seeks specific performance of the Option Agreement or alternatively, damages resulting from the breach.   The Court finds that Grant is entitled to specific performance of the Option Agreement and that Huggins must reconvey the Property to Grant as ordered herein. Accordingly, the Court grants judgment in favor of Grant on the Third Counterclaim.

**d.  Unjust Enrichment (Fourth Counterclaim)**

Grant asserts that she conveyed a non-gratuitous benefit to Huggins in the form of years of loan payments, payments of taxes, and maintenance expenses in connection with the Property. She further asserts that those payments were made under circumstances that render it inequitable for Huggins to retain said payments and that allowing Huggins to retain those payments and receive the benefit of the appreciation of the Property (now valued at approximately $442,000.00) without consideration to Grant, constitutes unjust enrichment.   Grant further argues that any payments Huggins made for property taxes and insurance from 1998 through present were his responsibility as the title owner of the Property and that she should not be required to offset the 2017 and 2018 property taxes she paid for the Property by the amounts Huggins paid since 2019.

Unjust enrichment is an equitable doctrine permitting the recovery of the amount a defendant has been unjustly enriched at the expense of the plaintiff.  *King v. Carolina First Bank,* 26 F.Supp.3d 510, 519 (D.S.C. 2014).  "One seeking to recover for unjust enrichment must show: (1) a benefit conferred by the plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it

inequitable for him to retain it without paying its value." *Chase Home Fin., LLC, v. Risher,* 746 S.E.2d 471, 476 (S.C. Ct. App. 2013).

Although the consideration paid for the transfer of the Property was less than the value of the Property at the time of the transfer, Huggins argues he did provide valuable consideration and that the transfer was a "fair deal" to Grant.  At the time the parties entered into the 1998 Contract and Option Agreement, the Property was worth approximately $57,400.00.   In addition to the $1.00 mentioned in the 1998 Contract, he assumed and paid the amount due from Grant to her mortgage creditor, Fleet Mortgage, which was $11,985.68; he paid $27,469.44 in property taxes, $21,026.94 for hazard insurance, and $10,175.00 for flood insurance.  Moreover, Huggins argues that Grant has derived the benefit of living in the Property since July of 2019 without paying rent, taxes, or insurance.

Under the circumstances, the Court believes it would be inequitable for Huggins to retain the benefit of the significant appreciation of the Property without paying its value to Grant. However, considering the Court's finding above that Huggins should be required to reconvey the Property to Grant, the Court denies Grant's unjust enrichment claim..[101]  The Court finds that Grant is not entitled to any further relief under the Fourth Counterclaim because, after all, she did reside in the Property for the past 26 years and any further damages or relief awarded to her aside from what is set forth in this Order would result in a windfall to Grant.

---

[101] In her proposed findings of fact and conclusions of law, Grant further appears to raise an argument that the property should be reconveyed back to Grant free of the mortgage currently encumbering the Property.  This issue was not raised at trial or in the pleadings, and it was not mentioned as one of the issues for the Court to decide in the Joint Statement of Dispute; therefore, it is not properly before the Court. *See Brown-Thomas v. Hynie*, No. 1:18-cv-2191-JMC, 2019 WL 8631704, at *7 n.10 (D.S.C. Aug. 21, 2019) ("[I]t is inappropriate for Defendant [ ] to raise important, substantive issues, that were never briefed, at oral argument because such actions significantly undermine the adversary system by putting Plaintiffs at an unfair disadvantage to counter unanticipated arguments.").  During trial, when specifically questioned about this issue, Grant's counsel acknowledged  that the issue of what happens with the Wells Fargo mortgage on the Property is not before the Court.

### e. Unconscionability of the Transaction (Fifth Counterclaim)

Grant asserts the real estate transaction proffered by Huggins was unconscionable because the terms of the agreements were so oppressive that no reasonable person would agree to them; as such, Grant argues the **entire** real estate transaction should be deemed unenforceable. She contends that Huggins never intended for her to repurchase the Property, instead intending to obtain title to property worth approximately $57,400.00 for approximately $12,000.00, and to receive payments from Grant totaling $78,840.00 over the next 30 years plus an undisclosed balloon payment at the conclusion of the term of their agreement. While the Court the transaction contemplated by the Option Agreement and 1998 Contract has lopsided terms favoring Huggins, the Court cannot find, based on the evidence and record before it, that it rose to the "unconscionable" level.

In South Carolina, "[u]nconscionability has been recognized as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Huskins v. Mungo Homes, LLC*, 439 S.C. 356, 368, 887 S.E.2d 534, 541 (Ct. App. 2023) (quoting *Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 361 S.C. 544, 554, 606 S.E.2d 752, 757 (2004)). "Absence of meaningful choice on the part of one party generally speaks to the fundamental fairness of the bargaining process in the contract at issue." *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 25, 644 S.E.2d 663, 669 (2007) (citing *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 295 (4th Cir. 1989)). In determining whether there was an absence of meaningful choice by a party to a contract, the Court should consider: (1) "the nature of the injuries suffered by the plaintiff;" (2) "whether the plaintiff is a substantial business concern;" (3) "the relative disparity in the parties' bargaining power;" (4) "the parties' relative sophistication;" (5)

"whether there is an element of surprise in the inclusion of the challenged clause;" and (6) "the conspicuousness of the clause." *Id.* (citing *Carlson*, 883 F.2d at 293). "Traditionally, a finding of unconscionability 'requires a showing of both substantive unconscionability, or unfairness in the contract itself, and procedural unconscionability, or unfairness in the bargaining process.' " *Hosey v. Quicken Loans, Inc.,* No. 1:17-cv-02060, 2017 WL 1471891, at *5 (D.S.C. Mar. 26, 2018) (quoting *McFarland v. Wells Fargo Bank, N.A.,* 810 F.3d 273, 277 (4th Cir. 2016). "A determination whether a contract is unconscionable depends upon all the facts and circumstances of a particular case." *Simpson*, 644 S.E.2d at 669 (quoting *Holler v. Holler*, 364 S.C. 256, 269, 612 S.E.2d 469, 476 (Ct. App. 2005)). Courts are limited to considering the facts and circumstances that exist at the time of the execution of the contract when determining unconscionability. *Hudson v. Hudson,* 757 S.E.2d 727, 730 (S.C. Ct. App. 2014). S.C. Code Ann. § 36-2-302(1) provides:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

A review of the 1998 Contract, Option Agreement and 2016 Amendment raises no doubt that the terms of these agreements are one-sided. The issue is whether the terms of these agreements are so oppressive that no reasonable person would agree to them and whether there was an absence of meaningful choice on the part of Grant in entering into these agreements. In support of her claim that the transaction was unconscionable, Grant points to the following terms, which she argues are unreasonably oppressive: Grant was (1) to sell her home worth approximately $57,400.00, in which she had equity of approximately $50,000.00, in exchange for $1.00 plus payment of the amount necessary to cure the default on the Fleet Mortgage in the amount of

$4,922.90;[102] (2) to pay Huggins more than $78,840.00 through 360 consecutive monthly payments of $219.00 to resolve a foreclosure debt of approximately $4,922.90; (3) subject to a strict forfeiture provision; (4) not permitted to record the Option Agreement; and (5) required to make an undisclosed balloon payment at the conclusion of the Option Agreement, determined to be $233,742.15 as of the date of trial, to exercise the option.  Grant also notes that the Option Agreement allowed Huggins to encumber the Property and receive proceeds from mortgages secured by the Property without any corresponding requirement to satisfy those mortgages when Grant exercised the option.

Based on the evidence and testimony of the parties, it is evident that Huggins enjoyed a much stronger bargaining position than Grant because Grant was in financial distress at the time. It is also evident that in January of 1998, Huggins was substantially more sophisticated than Grant due to his educational background and coursework in real estate.  Even though Huggins was not yet a licensed real estate professional at that time, he had taken coursework in real estate and Grant had only an eighth-grade education and no similar real estate experience.  However, there is no evidence that Huggins made false or misleading statements in connection with the transaction. The transaction took several months to fully complete, which provided Grant with time to reconsider or seek advice regarding the documents.

Thus, the Court is unable to conclude that their terms were so oppressive as to be unconscionable.  Grant was free to negotiate prior to obligating herself under those agreements but chose not to.  Moreover, to invalidate the Option Agreement and 1998 Contract and deem the entire transaction unenforceable, as Grant appears to suggest, would lead to Huggins having to possibly return the funds he received from her, which ultimately would result in a windfall to

---

[102] The 1998 Contract provided that the cure amount was not to exceed $4,500; however, Huggins elected to pay off the Fleet Mortgage in full for $11,985.68.

Grant. As a result of the transaction, Grant received the benefit of living in the Property for the past 26 years and her house is no longer in foreclosure. While receiving title to the Property subject to the encumbrance of the Wells Fargo mortgage may appear unfair, Grant agreed in the Option Agreement for Huggins to be able to mortgage the Property and there is no evidence regarding how the loan funds were used by Huggins. Accordingly, Grant's claim that the 1998 Contract and Option Agreement were unenforceable on grounds of unconscionability is denied.

### f.  Other Affirmative Defenses

As an affirmative defense to Huggins' claims, Grant asserts that Huggins' claims are barred by unclean hands, including actions constituting the unauthorized practice of law in closing a real estate transaction without an attorney and violation of Realtor's Code of Ethics and Standards of Practice. These defenses were not pursued at trial and no evidence was introduced to establish them. Even if pursued, as discussed above, the Court has denied Huggins' claims. Therefore, it is unnecessary to determine whether any of Grant's affirmative defenses apply.

### CONCLUSION

For the reasons set forth above, the Court concludes and orders as follows:

a.  Huggins' First Claim (Eviction and Possession pursuant to the South Carolina Residential Landlord Tenant Act (S.C. Code Ann. § 27-40-10, *et al.*)), Second Claim (Foreclosure); Third Claim (Breach of Contract); and Fourth Claim (Estoppel) are denied;

b.  Judgment is granted in favor of Grant on the Third Counterclaim (Breach of Contract). Huggins is in breach of the Option Agreement and Grant is entitled to specific performance as follows:  Huggins shall execute a general warranty deed transferring title to the Property to Grant within forty-five (45) days of the entry of this Order.

Pursuant to the Option Agreement, Grant shall pay Huggins $10.00 and shall also pay the attorney's fees related to the preparation of any documents required to revest the property in Grant's name.   Pursuant to Fed. R. Bankr. P. 7070, ownership of the Property is hereby divested from Huggins and vested in Grant.

c.   Judgment is granted in favor of Grant on the Fourth Counterclaim (Declaration of Equitable Mortgage). The Option Agreement is an equitable mortgage and Grant's obligations under the equitable mortgage have been satisfied, and she is entitled to receive title to the Property free and clear of any further obligation to Huggins, but subject to the outstanding mortgage to Wells Fargo.[103]

d.   Grant's First Counterclaim (False Pretenses, False Representations or Actual Fraud), Second Counterclaim (Violation of the South Carolina Unfair Trade Practices Act), and Fifth Counterclaim (Unjust Enrichment) are denied.

e.   Within sixty-days of the entry of this Order, Grant shall reimburse Huggins for the real estate taxes and hazard insurance on the Property for the year 2019 forward upon Huggins presenting her with documentation of their payment,[104] less the amount Grant paid for 2017 and 2018 taxes of $4,101.30, **in the total amount of $10,614.01 plus any additional amounts that may have come due in or after 2023**.[105]

---

[103] The issue of who is responsible for payment of the outstanding mortgage owed to Wells Fargo is not before the Court.

[104] From 2019 forward, Huggins paid taxes totaling $7,649.31 (excluding penalties and fees for late payments) and hazard insurance of $7,066.00.  The Court will not require Grant to reimburse Huggins for penalties he incurred by making late payments for taxes.  Since flood insurance was a requirement imposed subsequent to the transaction by Huggins' lender for the outstanding mortgage, the Court will not require Grant to reimburse Huggins for those costs.

[105] The total amount due under the Option Agreement was $78,840.00. The total of payments Grant made to directly to Huggins was $78,718.00, leaving a shortfall of $122.00.  Grant paid the 2017 and 2018 taxes for the Property in the amount of $4,223.30.  The difference between the taxes paid and the shortfall is $4,101.30.

     f.    All other requests for relief are denied.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**02/26/2024**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 02/26/2024